**Frontier Law Center**
Robert Starr (183052)
Adam Rose (210880)
Karo Karapetyan (318101)
Manny Starr (319778)
23901 Calabasas Rd, Suite 2074
Calabasas, CA 91302
Telephone: (818) 914-3433
Facsimile: (818) 914-3433
E-Mail: robert@frontierlawcenter.com
karo@frontierlawcenter.com
manny@frontierlawcenter.com

Counsel for Plaintiff

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GOR GEVORKYAN on behalf of himself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> BITMAIN TECHNOLOGIES, LTD., <br><br> Defendant. | Case No. 3:18-cv-07004-JD <br><br> **FIRST AMENDED CLASS ACTION COMPLAINT** <br><br> 1. **Violation of the Unfair Competition Law** <br> 2. **Conversion** <br> 3. **Unjust Enrichment** <br> 4. **Trespass to Chattel** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Gor Gevorkyan and all others similarly situated ("Plaintiff") allege the following:

## NATURE OF ACTION

1. This is a putative class action against Bitmain Technologies, Ltd. ("Bitmain" or "Defendant") in connection with the marketing and sale of its cryptocurrency mining devices known as Application Specific Integrated Circuit devices ("ASIC devices" and the "Products"). As alleged herein, Bitmain sells its ASIC devices months before the delivery. Upon information and belief, Bitmain mines cryptocurrency for itself using its customers devices before delivering them to the customers. In addition, since approximately September 2015, Bitmain ASIC devices are delivered to customers with the settings preconfigured to continue deliver Bitcoin to Bitmain rather than the customers who purchase them. These settings remain in effect until the complicated and time-consuming initialization procedures are completed.

2. The prospective class includes all purchasers of the following series' of Bitmain ASIC Devices in the United States: S7 Series;  S9 Series; S11 Series; S15 Series; S17 Series; A3 Series; B3 Series; B7 Series; D5 Series; DR Series; DR5 Series; E3 Series;  R4 Series; G2 Series;  G9 Series; L3 Series; T7 Series; T9 Series; Z9 Series; T15 Series; T17 Series; V9 Series; X3 Series; Z9 Series; and Z11 Series.

3. In the past, Bitmain ASIC devices could be configured and initialized in low-power mode that did not mine cryptocurrency for Bitmain. However, after Bitmain established itself as one of the world's largest cryptocurrency miners in the last several years, Defendant redesigned its ASIC devices to mine cryptocurrency for the benefit of itself rather than its customers who purchase the Products. Conveniently, Bitmain cashes in on every second it takes to get the ASIC configured with the customers' specifications and lays the substantial costs of operating the ASIC devices at the feet of its customers.

4. Defendant has engaged in an unfair business practice, has been unjustly enriched, has trespassed on its customers' chattel and converted the use of its customers' ASIC devices and electricity.

5. As a result of Defendant's scheme, Plaintiff and the class members were injured in fact and suffered ascertainable and out-of-pocket losses.

## THE PARTIES

6. Plaintiff Gor Gevorkyan is an individual domiciled in Los Angeles County, California.

7. Defendant Bitmain Technologies, Inc. is a Chinese corporation with its principal place of business in Beijing, China.

8. Bitmain conducts substantial business in the United States. The Company sells its ASIC devices directly to customers throughout the United States and in California.

9. Bitmain is the 100% owner of Bitmain, Inc., a company based in the United States and headquartered in California.

10. Bitmain has availed itself of the Court of the United States and has filed a federal action in a United States District Court.

11. Bitmain is reportedly planning to make an Initial Public Offering on a United States-based stock exchange.

12. Through one of its affiliates Antpool, Inc., Bitmain has sponsored the NBA team the Houston Rockets.

13. Bitmain operates several Bitcoin mining facilities in the United States and has announced plans to open a total of seventeen mining facilities in the United States.

## JURISDICTION AND VENUE

14. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than one hundred (100) Class Members and the

aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs.

15. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff and a substantial number of prospective class members purchased Bitmain ASIC devices from this District. Moreover, Defendant's wholly owned subsidiary and a former defendant in this case maintains its principal place of business in Santa Clara County within this District.

## FACTUAL ALLEGATIONS

### A. CryptoCurrency

16. Cryptocurrency is a form of digital currency using cryptography to secure electronic transactions and to control the creation of new virtual currency units. Popular forms of cryptocurrency include Bitcoin, Bitcoin Cash, Litecoin, and Etherium.

17. Bitcoin is by far the most popular form of cryptocurrency created as a new worldwide payment system in 2009. In the last several years, Bitcoin has become a preferred currency for many consumers and is accepted as a form of payment by many online retailers and service providers.

18. Though cryptocurrency is a form of "virtual currency," the value of cryptocurrency is very real. Bitcoin for example trades in currency markets at a rate of 1 Bitcoin to approximately $10,000.00 (last updated August 30, 2019).

19. The market for cryptocurrencies is known to be extremely volatile and subject to manipulation by large players in the market. For example, Defendant has admitted to engaging in a practice of destroying or "burning" virtual currency for the purpose of reducing the supply of the currency and raising its value. *See* https://www.ccn.com/bitmain-will-burn-12-of-bitcoin-cash-tx-fees-calls-on-other-miners-to-follow-suit/ ("By reducing the total supply of Bitcoin Cash in circulation, Bitmain believes that it can reduce sell pressure on the coin, ultimately making it more valuable.").

20. New cryptocurrency is created as a reward for a process known as mining. People compete to "mine" virtual currencies using computing power to solve complex math puzzle. These solutions are then used to encrypt and secure the cryptocurrency. The computers or pools of computers which are the first to solve these puzzles are rewarded with new cryptocurrency.

21. Once earned, virtual currency is stored in a digital wallet associated with the computing device that solved the puzzle.

22. Virtual currency mining is a passive process. These math puzzles are solved by computers using computer power. They do not require any calculations by the person mining the currency. As competition to create more virtual currency has increased, the mathematical puzzles have become more complex, making virtual currency more difficult to obtain. Computers that were once capable of efficiently mining Bitcoin could now take centuries to obtain the same results.

23. A mining pool is the pooling of resources by virtual currency miners, who share their processing power over a network to split the reward equally according to the amount of work they contributed to the probability of solving the puzzles. Mining in pools developed in response to the massive increase in difficulty of virtual currency mining.

24. As interest in virtual currency mining has increased in recent years, so too has the technology used to mine virtual currency. Initially, virtual currency was primarily mined by personal computers without any additional hardware. Later, video graphics cards were found to solve these math puzzles more quickly. Finally, dedicated ASIC devices became the standard device for cryptocurrency mining.

25. The core of cryptocurrency mining hardware lies in the ASIC chips. An ASIC is a chip specifically designed for a particular purpose and created to perform a designated function with maximum efficiency. Compared with general purpose processors such as CPUs, GPUs, and FPGAs which can perform multiple functions, an ASIC device is customized for a particular use and can offer enhanced speed and

efficiency due to its specificity. In addition, since an ASIC chip contains only the circuits needed for a specific application, it can be designed in smaller size, with lower power consumption, higher operating efficiency, and easier deployment in small and mobile connected devices.

26. ASIC devices can perform billions of calculations per second to try and crack the cryptographic puzzle that yields new Bitcoin.

27. ASIC devices consume so much electricity that their value to the customer is dependent in large part on the customer's local electricity costs. Indeed, it may take months or years to earn back the cost of purchasing and operating an ASIC device in virtual currency depending on the users' local electrical costs.

28. As competition increases and the technology to mine virtual currency improves, the cost of minting new virtual currency increases dramatically. It has been reported that the cost to mine virtual currency increased tenfold between 2016 and 2017 alone.

**B.  Bitmain ASIC Devices**

29. Founded in 2013, Bitmain markets and sells ASIC devices internationally. Far and away, Bitmain dominates the ASIC device industry.

30. Bitmain pioneered the offering of one-stop cryptocurrency mining solutions, ranging from the development of ASIC chips and mining hardware to the operations of mining farms and mining pools.

31. Bitmain is the largest single miner of virtual currency in the world. Most of Bitmain's revenue is generated from the sales of cryptocurrency mining hardware under the Antminer brand.

32. Bitmain also operates Antpool, the largest Bitcoin mining pool in the world. Defendant is also the largest competitor to each of its ASIC device customers because it maintains its own virtual currency mining machines and accounts. In addition to Bitmain's ASIC chip design business and in an effort to supplement its mining hardware sales business, Bitmain manages mining farms where it offers its

customers custodian services for their mining hardware, and operate mining pools where miners contribute their computing power and split mining rewards. As of June 30, 2018, Bitmain had opened 11 mining farms in the PRC, located in Sichuan Province, Xinjiang and Inner Mongolia, with an aggregate capacity to store approximately 200,000 sets of mining hardware.

33. Bitmain also primarily operates two mining pools, BTC.com and Antpool, the world's largest and second largest Bitcoin mining pools in terms of computing power. As of August 31, 2018, these two mining pools together contributed to approximately 37.1% of the aggregate hashrate of the Bitcoin network calculated by their aggregate block rewards as a percentage of the total block rewards generated from the Bitcoin network for the preceding 12 months.

34. Bitmain operates more than a dozen virtual currency mining "farms" in locations where electricity costs are extremely low, including Russia, Sichuan, Xinjang and Inner Mongolia, China and certain low-cost energy locations in the United States. Bitmain operates hundreds of thousands of ASIC devices on these farms.

35. In or about March 2019, Bitmain announced plans to deploy an additional 200,000 ASIC devices at its mining farms in China.

36. Analysts estimate that Bitmain made $3 - $4 billion in operating profits in 2017. With its recent expansion of operations, the company is reportedly striving for a valuation of $12 billion in its planned United States initial public offering.



*Figure 2: Bitmain Bitcoin Mining Device AntMiner S9*

37. Defendant markets and sells a number of ASIC devices that work using the same or similar interface and setup procedures. At any given time, the devices range in price based on the speed with which they can perform calculations. Moreover, because the value of an ASIC device is so closely linked to its ability to generate virtual

currency through sheer processing power, Bitmain varies the price of its ASIC devices based on the current trading price of Bitcoin, a leading form of cryptocurrency.

38. Compared to other computer components, ASIC devices consume an enormous amount of energy when operating at full speed. For example, the AntMiner S9 pictured above is rated at 1375 watts of power, while a standard light bulb is rated at only 60 to 100 watts. Because of these extremely high operating costs, it is necessary to consider operating costs and local electricity prices in determining the value of an ASIC device.

### C. Bitmain Uses Its Customers' Purchased ASIC Devices To Mine Bitcoin for Itself Prior to Delivery to the Customers

39. Bitmain sells cryptocurrency mining hardware mainly through online direct sales via its websites.

40. On the date that Bitmain sells a new ASIC device, the product is at its most valuable. The first few months after a new model of ASIC device is issued are critical to the value obtained from mining a single unit of cryptocurrency. Once the market is flooded with the new devices, the difficulty of mining a single unit of cryptocurrency dramatically increases, and the value of the device dramatically decreases.

41. The devices have a short window of profitability due to the fact that the difficulty of mining virtual currency greatly increases in the months following the issuance of a new more powerful device. Thus, an ASIC device can become worthless in a matter of months of its release.

42. The website https://www.asicminervalue.com/ (as of August 30, 2019) measures the profitability of ASIC mining devices after accounting for average electricity operating costs. The site indicates that Bitmain devices manufactured just over one year ago (prior to July 2018) will generate less cryptocurrency than they will cost to operate based on those costs, suggesting those older devices are now essentially worthless to most purchasers.

43. Sales of ASIC devices are made in advance and Bitmain provides its customers with an anticipated delivery date of their device, often more than a month after the date of the customer's purchase.

44. In practice, Bitmain regularly fails to deliver the ASIC devices by those delivery dates and often delivers ASIC devices more than a month late.

45. When customers have complained about the long wait times for receipt of their ASIC devices, Defendant has informed them that that the delay is due to their quality control burn-in procedures.

46. Bitmain sells its ASIC devices as though they are new.

47. Upon information and belief, after purchase and before delivery of the new ASIC devices, Bitmain uses the customers' ASIC devices at its virtual currency mining farms in order to generate Bitcoin for its own benefit rather than the benefit of its customers, during this critical period of time when the ASIC devices are most profitable.

48. Plaintiff and many Bitmain customers have reported that Bitmain delivered to them devices that were obviously in used condition. For example, customers have reported receiving devices with substantial dents and wear and tear and devices with substantial amounts of dust caked on to the electronic components of the device.

49. These indicators are consistent with use by Bitmain of those devices at its mining facilities, including the Inner Mongolia farm which is located near an open pit coal mine, from which Bitmain obtains is cheap electricity used to operate the devices.

50. It has been reported that the dust from the coal mine regularly infiltrates the machines. https://qz.com/1054805/what-its-like-working-at-a-sprawling-bitcoin-mine-in-inner-mongolia/ (last visited August 30, 2019). The article notes: "Each building is surrounded by two fine-wire mesh fences. They are designed to keep out

the dust of Inner Mongolia, which can, and often does, cause the machines to break down. Layers of dust can infiltrate the machines, causing them to overheat."

51. Rather than legitimately burning in the new ASIC devices, Bitmain appears to be burning those devices out, prior to delivering them to its customers.

52. Bitmain does not inform its customers that it is actually using their devices to mine virtual currency for itself.

53. Moreover, increasing the financial injury to its customers, Defendant devalues the ASIC devices after purchase through its use of the customers' devices before delivery. By the time customers receive the ASIC devices they purchased months earlier (and often long after their estimated delivery date), the value of the device is severely diminished because the cost of mining a single unit of cryptocurrency has substantially increased.

### D. **Bitmain Continues to Use Customer Purchased ASIC Devices to Mine Bitcoin for Itself After Delivery to the Customer**

54. According to Bitmain's own financial documents, Bitmain recognizes revenue on sales of mining hardware when customers obtain control over the ASIC devices, which it says "usually occurs when the logistics company, as selected by customers, picks up the mining hardware from our premises and the associated legal titles and risks and rewards are transferred."

55. However, even after delivery of the ASIC devices and the legal titles and risks are transferred to its customers, Bitmain continues to reap the rewards that rightfully belong to its customer, leaving those customers to pay for the extensive operating costs of the devices during that time.

56. Bitmain ASIC devices can often take an extremely long time to initiate. The initialization process can take many hours and up to several days to complete.

57. During this time, Defendant uses its customers' ASIC devices and customers' electrical power sources to enrich itself at the expenses of its customers.

58. Until approximately September 2015, Bitmain ASIC devices started in low power mode, while the customer linked the device to her virtual currency account. Only after the setup process was complete, would the devices fully power up and channel incoming virtual currency to the owner's virtual currency account. While the customer was initiating the setup procedures, the ASIC devices were not mining virtual currency for anyone and were not consuming large amounts of electricity. There was no default account setting to which virtual currency was directed and transferred during the setup procedure.

59. Beginning in approximately September 2015 with the release of the Antminer S7 Series and continuing thereafter, Bitmain changed the startup procedure for its ASIC devices such that the devices immediately start in full power high energy consumption mode before the customer's account is linked to the device and stay in that mode until the setup process is complete.

60. Now, the default account setting on the Bitmain ASIC devices is set to contribute to Bitmain's own account on its own Antpool server. During the entire set up process, the customers' ASIC machine mine cryptocurrency for Bitmain.

61. Thus, Bitmain requires its customers to bear the additional operating costs of the ASIC devices during the setup phase, while Bitmain's customers' ASIC devices transfers virtual currency to Bitmain rather than the Products' rightful owners.

E. **Plaintiff's Experience**

62. In approximately January 2018, Plaintiff Gor Gevorkian purchased 20 Bitmain Antminer S9 directly from Bitmain's website https://www.bitmain.com. He purchased Bitmain ASIC devices, including the Antminer S9 for the purpose of mining cryptocurrency for his financial benefit.

63. The Product description and pictures gave Plaintiff Gevorkian the impression that the Products were being sold as new.

64. The ASIC devices purchase by Plaintiff were delivered approximately three (3) months after Plaintiff Gevorkyan paid for them which was well after the estimated delivery date provided by Bitmain.

65. When the products were finally delivered, Plaintiff Gevorkyan observed excessive dust on the fans and inside of the Products, indicating that they had been used for a substantial amount of time in dusty conditions.

66. The Products failed to live up the implied claim that the products were new and that they would produce a substantial profit when using it to mine Bitcoin.

67. Bitmain did not disclose to Plaintiff that it was going to use the Products for mining virtual currency for its own benefit before shipping them to Plaintiff.

68. Bitmain did not disclose to Plaintiff that the Products would be preconfigured to deliver virtual currency to Bitmain's virtual currency account during the setup procedures as soon as the Products were connected to the power supply and the internet.

69. The Product was difficult to configure. It took him a substantial amount of time to properly configure the ASIC devices. During this time, the ASIC devices were pre-configured to mine and deliver cryptocurrency to Defendant. Also, during this time, the ASIC devices operated at full power mode, consuming a substantial amount of electricity at Plaintiff's expense.

70. The ASIC devices remained configured to deliver Bitcoin to Bitmain until they were associated with Plaintiff's personal cryptocurrency account at the end of the setup procedure.

71. The Products received by Plaintiff Gevorkyan were not new and by the time he received them, they were too old and too weak to produce a substantial profit at the substantially increased difficulty level for mining.

72. At the time of his purchase, Plaintiff Gevorkyan was not aware that the products would be delivered late, used, and pre-programmed to mine for Bitmain at his expense.

## CLASS ACTION ALLEGATIONS

73. Plaintiff brings this action as a class action under Federal Rule of Civil Procedure 23 on behalf of a Class consisting of all persons in the United States who, within the relevant statute of limitations period, purchased Bitmain ASIC devices sold on or after September 2015.

74. Plaintiff also seeks to represent a subclass defined as all members of the Class who purchased Bitmain ASIC devices in California ("the California Subclass").

75. The Class is so numerous that joinder of all members is impractical. On information and belief, the Class includes more than one hundred thousand members.

76. The Class is ascertainable because the Class Members can be identified by objective criteria – the purchase of Bitmain ASIC mining devices during the Class Period. Individual notice can be provided to Class Members "who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B).

77. There are numerous questions of law and fact common to the Class which predominate over individual actions or issues, including but not limited to:

    (a) Whether Defendant received Bitcoin through the use of the Class Members' ASIC devices after purchase and before delivery to Class Members;

    (b) Whether Defendant received Bitcoin mined from the Class Members' ASIC devices after those devices were delivered to customers;

    (c) Whether Class Members were required to pay electricity costs for the mining of Bitcoin received by Bitmain;

    (d) Whether Bitmain engaged in an unfair business practice;

    (e) Whether Bitmain converted the use of Class Members' ASIC devices to its own ends;

(f) Whether Bitmain trespassed on Class Members' ASIC devices by sending and receiving electronic signals without the consent of the rightful owners;

(g) Whether Defendant was unjustly enriched by its conduct;

(h) Whether Class Members suffered an ascertainable loss as a result of Defendants' conduct; and

(i) Whether, as a result of Defendant's misconduct as alleged herein, Plaintiff and the Class Members are entitled to restitution, injunctive, monetary relief and/or costs and attorneys' fees, and if so, the amount and nature of such relief.

78. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendant's wrongful conduct. Plaintiff has no interests antagonistic to the interests of the other members of the Class. Plaintiff and all members of the Class have sustained economic injury arising out of Defendant's violations of common and statutory law as alleged herein.

79. Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class Members he seeks to represent, he has retained counsel competent and experienced in prosecuting class actions, and he intends to prosecute this action vigorously. The interests of the Class Members will be fairly and adequately protected by Plaintiff and his counsel.

80. The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Plaintiff and the Class Members.

## First Cause of Action

## Violation of the Unfair Competition Law

81. Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

82. Plaintiff brings this Count on behalf of the California Subclass.

83. The UCL, Bus. & Prof. Code § 17200 *et seq.*, provides, in pertinent part: "Unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising …."

84. Defendant violated the "unfair" prong of the UCL in that their conduct is substantially injurious to customers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous, as the gravity of the conduct outweighs any alleged benefits. Defendant's conduct is unfair in that the harm to Plaintiff and the Class arising from Defendant's conduct outweighs the utility, if any, of those practices.

85. Defendants' conduct is substantially injurious to customers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous, as the gravity of the conduct outweighs any alleged benefits. Defendant's conduct is unfair in that the harm to Plaintiff and the Class arising from Defendant's conduct outweighs the utility, if any, of those practices.

86. Defendant's practices as described herein are of no benefit to consumers whose ASIC devices are used by Bitmain to mine Bitcoin for itself rather than its customers.

87. Defendant's practices as described herein are of no benefit to consumers who are tricked into mining virtual currency for the benefit of Bitmain instead of themselves, while using electricity at the customers' cost.

88. Defendant also violated the "fraudulent" prong of the UCL because Defendant sold the ASIC devices as though they were new even though the devices were delivered in used condition after Defendant had already extracted much of the value from the devices. Moreover, Defendant failed to disclose that they products were not new and failed to disclose that the ASIC devices were preconfigured to mine cryptocurrency for Defendant at the expense of its customers.

89. Plaintiff and the California Class Members are not sophisticated experts with independent knowledge of the formulation or efficacy of the Products, and they acted reasonably when they purchased the Products based on their belief that Defendant's express and implied misrepresentations and omissions were true.

90. As a direct and proximate result of these acts, Bitmain's customers have been and are being harmed. Plaintiff and members of the Class have suffered injury and actual out-of-pocket losses as a result of Defendant's UCL "unfair prong" violation because Bitmain: 1) used its customers' ASIC devices after purchase and prior to delivery to mine Bitcoin for itself; and 2) used its customers' ASIC devices and required them to incur operating expenses while mining virtual currency not for their own benefit, but for the benefit of Bitmain after delivery of the devices.

91. Pursuant to Bus. & Prof. Code §17203, Plaintiff, and the California Class are therefore entitled to: (a) an order requiring Defendant to cease the acts of unfair competition alleged herein; (b) full restitution for the use of the ASIC devices and for of all operating expenses incurred as a result of Bitmain's unfair and deceptive practices; (c) interest at the highest rate allowable by law; and (d) the payment of Plaintiff's attorneys' fees and costs pursuant to, *inter alia*, California Code of Civil Procedure §1021.5.

**Second Cause of Action**

**Unjust Enrichment**

92. Plaintiff repeats and realleges the foregoing paragraphs.

93. Plaintiff brings this claim on behalf of the class against Defendant. Defendant has been unjustly enrichment by the conduct described above.

94. Unjust enrichment requires the receipt of a benefit and unjust retention of the benefit at the expense of another.

95. Defendant received the benefit of class members' ASIC devices after purchase and prior to delivery.

96. Defendant received the benefit of class members ASIC devices after delivery to Class Members, while the operating expenses, including electricity fell on Class Members rather than Defendant.

97. Defendant should be required to disgorge all monies, profits and gains which it has obtained and will unjustly obtain at the expense of Plaintiff and the Class and reimburse Plaintiff and the class for their use of and operating expenses of their ASIC devices during the time in which Defendant received benefits from Class members' ASIC devices.

### Third Cause of Action

### Conversion

98. Plaintiff repeats and realleges the foregoing paragraphs.

99. Plaintiff brings this claim on behalf of the class against Defendant. Defendant has converted the use of Plaintiff's and Class members' ASIC devices.

100. Plaintiff and other class members held an ownership interest in the ASIC devices.

101. Defendant converted Class Members' ASIC devices routing mined Bitcoin to Bitmain controlled servers for the benefit of Bitmain after purchase and before delivery of the ASIC devices.

102. Defendant exercised dominion and control of Class Member ASIC devices for a substantial period of time, during a period of time when the devices were the most profitable.

103. Defendant acted intentionally to deprive Class Members of other use of the ASIC devices by using those devices for its own benefit prior to delivery, preconfiguring the settings to mine Bitcoin for Bitmain's benefit, and changing the configuration procedures to work only in full power, rather than low power mode.

104. Additionally, Defendant has converted Plaintiff's electric power for the benefit of its own crypto mining.

105. Defendant acted in bad faith. According to Bitmain's own revenue accounting policy, Bitmain considered the devices sold when the customers took possession, yet Bitmain continued to mine the devices and derive benefits from them to consumers' detriment.

106. As a direct and proximate result of Bitmain's conversion, Plaintiff and Class Members suffered damages in the form of the reduction in value of the used devices inability to maximize the mining potential of the devices and increased operating expenses of the ASIC devices in order for the devices to be used for Bitmain's benefit.

107. Defendant should be required to disgorge all monies, profits and against which it has obtained from the conversion, reimburse Plaintiff and other Class members for the operating expenses of their ASIC devices during the time in which Defendant received benefits from Class members, and reimburse Class Members the full value of the ASIC devices.

## Fourth Cause of Action
## Trespass to Chattel

108. Plaintiff repeats and realleges the foregoing paragraphs.

109. Plaintiff brings this claim on behalf of the class against Defendant. Defendant has trespassed Plaintiff's and Class members' ASIC devices.

110. Plaintiff and Class Members did not consent to BitMain's use of their ASIC devices for Bitmain's financial gain.

111. Bitmain interfered with Plaintiffs and Class Members' possessory interest in the ASIC devices they purchased from Bitmain.

112. Bitmain used Class Member's ASIC devices for up to four months after the date of purchase and before delivery.

113. Additionally even after delivery of the ASIC devices to Class Members, Bitmain intentionally trespassed on Plaintiff and the Class Members' chattels by configuring the devices to deliver mined bitcoin to Bitmain controlled servers for the benefit of Bitmain while Class Members completed the complicated setup procedures.

114. Bitmain intentionally trespassed on Plaintiff and the Class Members' chattels by using Class Members' electricity to mine Bitcoin to Bitmain controlled servers for the benefit of Bitmain after delivery of the ASIC devices.

115. As a direct and proximate result of Bitmain's trespass, Plaintiff and Class Members suffered damages in the form of the reduction in value of the used devices, and increased operating expenses of the ASIC devices in order for the devices to be used for Bitmain's benefit.

116. Defendant should be required to disgorge all monies, profits and against which it has obtained from the trespass and reimburse Plaintiff and other Class members for the operating expenses of their ASIC devices during the time in which Defendant received benefits from Class members.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action;

B. For an order declaring that Defendant's conduct violates the statutes and common law claims referenced herein;

C. Awarding restitution, compensatory damages and/or disgorgement in favor of Plaintiff, members of the Class, and the California Class against Defendant for all harm suffered as a result of Defendant's wrongdoing, in an amount to be proven at trial, including interest thereon;

D. Awarding injunctive relief against Defendant to prevent Defendant from continuing their ongoing unfair, unconscionable, and/or deceptive acts and practices;

E. For an order of restitution and/or disgorgement and all other forms of equitable monetary relief;

F.  Awarding Plaintiff and members the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

G.  Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims so triable in this action.

Dated:  August 30, 2018          FRONTIER LAW CENTER

*/s/ Adam Rose*
Robert Starr (183052)
Adam Rose (210880)
Karo Karapetyan (318101)
Manny Starr (319778)
23901 Calabasas Rd, Suite 2074
Calabasas, CA 91302
Telephone: (818) 914-3433
Facsimile: (818) 914-3433
E-Mail:   robert@frontierlawcenter.com
              adam@frontierlawcenter.com
              karo@frontierlawcenter.com
              manny@frontierlawcenter.com

Jordan L. Lurie
Pomerantz LLP
1100 Glendon Avenue
15th Floor
Los Angeles, CA 90024
Telephone: 310-405-7190
Facsimile: 917-463-1044
Email: jllurie@pomlaw.com

Christopher Marlborough
The Marlborough Law Firm, P.C.
445 Broad Hollow Road, Suite 400
Melville, NY 11747
Telephone: (212) 991-8960
Facsimile: (212) 991-8952
E-Mail:  chris@marlboroughlawfirm.com

Attorneys for Plaintiff