**EXHIBIT**

**15**

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C.  20549**

**FORM 8-K**

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15(D) OF**
**THE SECURITIES EXCHANGE ACT OF 1934**

Date of Report (Date of earliest event reported): December 22, 2020 (December 18, 2020)

## Riot Blockchain, Inc.

(Exact name of registrant as specified in its charter)

| Nevada | 001-33675 | 84-1553387 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**202 6th Street, Suite 401, Castle Rock, CO 80104**

(Address of principal executive offices)

**(303) 794-2000**

(Registrant's telephone number, including area code)

(Former name, former address, and former fiscal year, if changed since last report.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock | RIOT | NASDAQ Capital Market |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 1.01 – Entry into a Material Definitive Agreement.**

*Sale and Purchase Agreement for 3,000 S19 Pro (110 TH/s) Miners*

On December 18, 2020, Riot Blockchain, Inc. ("**Riot**," "**us**," "**we**," "**our**," or the "**Corporation**") entered into a sale and purchase agreement (the "**S19 Pro Agreement**") with Bitmain Technologies Limited ("**Bitmain**"), for the purchase of 3,000 Antminer S19 Pro (110 Terahash per second) ("TH/s") digital currency miners (the "**S19 Pro Miners**"). Pursuant to the S19 Pro Agreement, Riot will pay Bitmain approximately US$8.6 million (subject to adjustments, offsets and costs as set forth in the S19 Pro Agreement) (the "**S19 Pro Purchase Price**") in exchange for the 3,000 S19 Pro Miners, to be paid in stages as follows:

- Thirty percent (30%) of the S19 Pro Purchase Price as a refundable down payment paid on execution of the S19 Pro Agreement;

- Twenty percent (20%) of the S19 Pro Purchase Price to be paid on or before December 31, 2020;

- Fifteen percent (15%) of the S19 Pro Purchase Price to be paid on or before March 15, 2021;

- Twenty percent (20%) of the S19 Pro Purchase Price to be paid on or before April 15, 2021; and

- The remaining fifteen percent (15%) of the S19 Pro Purchase Price to be paid on or before May 15, 2021.

Pursuant to the S19 Pro Agreement, shipment of the 3,000 S19 Pro Miners will be made in three (3) approximately equal installments of 1,000 S19 Pro Miners, with the first shipment to occur on or before May 31, 2021, the second to occur on or before June 30, 2021, and the third to occur on or before July 31, 2021.

The foregoing description of the S19 Pro Agreement does not purport to be complete and is qualified in its entirety by reference to the S19 Pro Agreement, a copy of which is filed as Exhibit 10.1 to this Current Report on Form 8-K (this "**Report**") and is incorporated into this Report by reference.

*Sale and Purchase Agreement for 12,000 S19j Pro (100 TH/s) Miners*

On December 18, 2020, Riot entered into an additional sale and purchase agreement (the "**S19j Pro Agreement**") with Bitmain for the purchase of 12,000 Antminer S19j Pro (100 TH/s) digital currency miners (the "**S19j Pro Miners**"). Pursuant to the S19j Pro Agreement, Riot will pay Bitmain approximately US$26.3 million (subject to adjustments, offsets and costs as set forth in the S19j Pro Agreement) (the "**S19j Pro Purchase Price**") in exchange for the 12,000 S19j Pro Miners, to be paid in stages as follows:

- Ten percent (10%) of the S19j Pro Purchase Price as a refundable down payment paid on execution of the S19j Pro Agreement;

- Twenty percent (20%) of the S19j Pro Purchase Price to be paid on or before January 15, 2021;

- Twenty percent (20%) of the S19j Pro Purchase Price to be paid on or before February 25, 2021;

- Ten percent (10%) of the S19j Pro Purchase Price to be paid on or before June 15, 2021;

- Fifteen percent (15%) of the S19j Pro Purchase Price to be paid on or before July 15, 2021; and

- The remaining twenty-five percent (25%) of the S19j Pro Purchase Price to be paid on or before August 13, 2021.

Pursuant to the S19j Pro Agreement, shipment of the 12,000 S19j Pro Miners will be made in three (3) installments as follows: (i) 2,000 to be shipped on or before August 31, 2021; (ii) 4,000 to be shipped on or before September 30, 2021; and (iii) the remaining 6,000 to be shipped on or before October 31, 2021.

The foregoing description of the S19j Pro Agreement does not purport to be complete and is qualified in its entirety by reference to the S19 Pro Agreement, a copy of which is filed as Exhibit 10.2 to this Report and is incorporated into this Report by reference.

**Item 8.01 – Other Events.**

On December 21, 2020, Riot issued a press release announcing the S19 Pro Agreement and the S19j Pro Agreement, as disclosed under Item 1.01 of this Report. A copy of the Corporation's press release announcing the agreements is attached hereto as Exhibit 99.1.

The information provided under this Item 8.01, including Exhibit 99.1, is being furnished by the Corporation pursuant to this Item 8.01 only and shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, nor shall it be incorporated by reference in any filing under the Securities Act of 1933, as amended, except as expressly set forth in any such filing.

**About Riot Blockchain, Inc.**

Information reported in this Current Report on Form 8-K is limited to the scope of the information reportable under a Current Report on Form 8-K under the rules and regulations of the Commission. Please refer to the additional information concerning the Corporation referenced in the following notices and safe harbor provision for material risks and other uncertainties.

**Investor Notice**

An investment in the Corporation's common stock involves a high degree of risk, and an investor should only purchase the Corporation's securities if he or she can afford to suffer the loss of his or her entire investment. In determining whether to purchase the Corporation's common stock, an investor should carefully consider all of the material risks described under Item 1A under the heading "Risk Factors" in our most recent Annual Report on Form 10-K for the year ended December 31, 2019, filed with the SEC on March 25, 2020, as amended, and as supplemented and updated by subsequent Quarterly Reports on Form 10-Q and Current Reports on Form 8-K, together with the financial or other information contained or incorporated by reference in such reports. In addition to the risks discussed in these reports, other risks not presently known to us or that we currently believe to be immaterial may also adversely affect our business, financial condition and results of operations, perhaps materially. The discussions regarding material risks also include forward-looking statements, and actual results and events may differ substantially from those discussed or highlighted in those forward-looking statements.

**Safe Harbor**

The information provided in this Report may include forward-looking statements relating to future events or the future financial performance of the Corporation. Because such statements are subject to risks and uncertainties, actual results may differ materially from those expressed or implied by such forward-looking statements. Words such as "anticipates," "plans," "expects," "intends," "will," "potential," "hope" and similar expressions are intended to identify forward-looking statements. These forward-looking statements are based upon current expectations of the Corporation and involve assumptions that may never materialize or may prove to be incorrect. Actual results and the timing of events could differ materially from those anticipated in such forward-looking statements as a result of various risks and uncertainties. Detailed information regarding factors that may cause actual results to differ materially from the results expressed or implied by statements in report relating to the Corporation may be found in the Corporation's periodic filings with the Commission, including the factors described in the sections entitled "Risk Factors," copies of which may be obtained from the SEC's website at www.sec.gov. The Corporation does not undertake any obligation to update forward-looking statements contained in this Report.

**Item 9.01.**          **Financial Statements and Exhibits.**

(d) Exhibits.

| Exhibit Number | Description |
| --- | --- |
| 10.1† | Sale and Purchase Agreement by and between Riot Blockchain, Inc. and Bitmain Technologies Limited, dated as of December 18, 2020, for the acquisition of 3,000 S19 Pro (110 TH/s) Miners. |
| 10.2† | Sale and Purchase Agreement by and between Riot Blockchain, Inc. and Bitmain Technologies Limited, dated as of December 18, 2020, for the acquisition of 12,000 S19j Pro (100 TH/s) Miners. |
| 99.1 | Press Release, issued by Riot Blockchain, Inc. on December 21, 2020, announcing the foregoing agreements with Bitmain (furnished pursuant to Item 8.01 of this Current Report on Form 8-K).* |

† Portions of this Exhibit have been omitted as confidential information.

* The information contained in this Press Release is furnished but not filed for purposes of Section 18 of the Securities Exchange Act of 1934, as amended.

## S I G N A T U R E

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

RIOT BLOCKCHAIN, INC.

Date: December 22, 2020

By:   */s/ Jeffrey McGonegal*

Jeffrey McGonegal
Chief Executive Officer

[****] Certain information in this exhibit has been omitted pursuant to Item 601(b)(10)(iv) of Regulation S-K because it is both (i) not material and (ii) would likely cause competitive harm to the registrant if publicly disclosed.

# SALES AND PURCHASE AGREEMENT

## BETWEEN

## Bitmain Technologies Limited
## ("Bitmain")

## AND

## Riot Blockchain, Inc.
## ("Purchaser")

1.  Definitions and Interpretations                                          3
2.  Sales of Product(s)                                                      5
3.  Prices and Terms of Payment                                             6
4.  Shipping of Product(s)                                                  6
5.  Customs                                                                  8
6.  Warranty                                                                 8
7   Representations and Warranties                                           9
8   Indemnification and Limitation of Liability                             10
9   Distribution                                                            11
10  Intellectual Property Rights                                            11
11  Confidentiality and Communications                                      12
12  Term and Termination of this Agreement                                  12
13  Contact Information                                                     13
14  Compliance with Laws and Regulations                                    14
15  Force Majeure                                                           15
16  Entire Agreement and Amendment                                         15
17  Assignment                                                             15
18  Severability                                                           15
19  Personal Data                                                          16
20  Conflict with the Terms and Conditions                                 16
21  Governing Law and Dispute Resolution                                   16
22  Waiver                                                                 16
23  Counterparts and Electronic Signatures                                 17
24  Further Assurance                                                      17
25  Third Party Rights                                                     17

This agreement (this "Agreement") is made on <u>December 18, 2020</u> by and between Bitmain Technologies Limited ("Bitmain") (Company number: [****]), with its registered office at Unit A1 of Unit A, 11th Floor, Success Commercial Building, 245-251 Hennessy Road, Hong Kong, and Riot Blockchain, Inc. (the "Purchaser") with its principal place of business at 202 6th Street, Suite 401, Castle Rock, CO 80104, USA.

Bitmain and the Purchaser shall hereinafter collectively be referred to as the "Parties", and individually as a "Party".

Whereas:

1.  Purchaser fully understands the market risks, the price-setting principles and the market fluctuations relating to the Products sold under this Agreement.

2.  Purchaser has purchased Products through the website of Bitmain (i.e., https://shop.bitmain.com/, similarly hereinafter), and is generally familiar with the purchase order processes of Bitmain's website.

3.  Based on the above consensus, the Purchaser is willing to purchase and Bitmain is willing to supply cryptocurrency mining hardware and other equipment in accordance with the terms and conditions of this Agreement.

The Parties hereto agree as follows:

## 1.  Definitions and Interpretations

The following terms, as used herein, have the following meanings:

"Affiliate" means, with respect to any Person, any other Person directly or indirectly Controlling, Controlled by, or under common Control with such Person; "Person" means any individual, corporation, partnership, limited partnership, proprietorship, association, limited liability company, firm, trust, estate or other enterprise or entity (whether or not having separate legal personality); and "Control" means the power or authority, whether exercised or not, to direct the business, management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, provided that such power or authority shall conclusively be presumed to exist upon possession of beneficial ownership or power to direct the vote of more than fifty percent (50%) of the votes entitled to be cast at a meeting of the members or shareholders of such Person or power to control the composition of a majority of the board of directors of such Person. The terms "Controlled" and "Controlling" have meanings correlative to the foregoing.

"Applicable Law" means any treaty, law, decree, order, regulation, decision, statute, ordinance, rule, directive, code or other document that has legal force under any system of law, including, without limitation, local law, law of any other state or part thereof or international law, and which creates or purports to create any requirement or rule that may affect, restrict, prohibit or expressly allow the terms of this Agreement or any activity contemplated or carried out under this Agreement.

3

"Bank Account" means the bank account information of Bitmain provided in Appendix A of this Agreement.

"Force Majeure" means in respect of either Party, any event or occurrence whatsoever beyond the reasonable control of that Party, which delays, prevents or hinders that Party from performing any obligation imposed upon that Party under this Agreement, including to the extent such event or occurrence shall delay, prevent or hinder such Party from performing such obligation, war (declared or undeclared), terrorist activities, acts of sabotage, blockade, fire, lightning, acts of god, national strikes, riots, insurrections, civil commotions, quarantine restrictions, epidemics, earthquakes, landslides, avalanches, floods, hurricanes, explosions and regulatory and administrative or similar action or delays to take actions of any governmental authority.

"Insolvency Event" in the context of the Purchaser means any of the following events:

i)      a receiver, receiver and manager, judicial manager, official manager, trustee, administrator or similar official is appointed, or steps are taken for such appointment, over all or any part of the assets, equipment or undertaking of the Purchaser;

ii)     if the Purchaser stops or suspends payments to its creditors generally, is unable to or admits its inability to pay its debts as they fall due, seeks to enter into any composition or other arrangement with its creditors, is declared or becomes bankrupt or insolvent or enters into liquidation;

iii)    a petition is presented, a proceeding is commenced, an order is made or an effective resolution is passed or any other steps are taken by any person for the liquidation, winding up, insolvency, judicial management, administration, reorganisation, reconstruction, dissolution or bankruptcy of the Purchaser, otherwise than for the purpose of a bona fide scheme of solvent amalgamation or reconstruction; or

iv)     if any event, process or circumstance analogous or having a substantially similar effect to any of the above, in any applicable jurisdiction, commences or exists.

"Intellectual Property Rights" means any and all intellectual property rights, including but not limited to those concerning inventions, patents, utility models, registered designs and models, engineering or production materials, drawings, trademarks, service marks, domain names, applications for any of the foregoing (and the rights to apply for any of the foregoing), proprietary or business sensitive information and/or technical know-how, copyright, authorship, whether registered or not, and any neighbor rights.

"Order" means the Purchaser's request to Bitmain for certain Product(s) in accordance with this Agreement.

"Order Con irmation" means Bitmain's acceptance of the Order.

4

"Product(s)" means the merchandise that Bitmain will provide to the Purchaser in accordance with this Agreement.

"Total Purchase Price" means the aggregate amount payable by the Purchaser as set out in Appendix A of this Agreement.

"Warranty Period" means the period of time that the Product(s) are covered by the warranty granted by Bitmain or its Affiliates in accordance with Clause 6 of this Agreement.

"Warranty Start Date" means the date on which the Product(s) are delivered to the carrier.

Interpretations:

i)      Words importing the singular include the plural and vice versa where the context so requires.

ii)     The headings in this Agreement are for convenience only and shall not be taken into consideration in the interpretation or construction of this Agreement.

iii)    References to Clauses and Appendix(es) are references to Clauses and Appendix(es) of this Agreement.

iv)     Unless specifically stated otherwise, all references to days shall mean calendar days.

v)      Any reference to a code, law, statute, statutory provision, statutory instrument, order, regulation or other instrument of similar effect shall include any re-enactment or amendment thereof for the time being in force.

## 2.  Sales of Product(s)

Bitmain will provide the Product(s) set forth in Appendix A (attached hereto as part of this Agreement) to the Purchaser in accordance with provisions of Clause 2, Clause 3, Clause 4, Clause 5 and Appendix A of this Agreement, and the Purchaser shall make payment in accordance with the terms specified in this Agreement.

2.1.    Both Parties agree that the Product(s) shall be sold in accordance with the following steps:

(i)     The Purchaser shall place the Order through Bitmain's website or through other methods accepted by Bitmain, and such Order shall constitute an irrevocable offer to purchase specific Product(s) from Bitmain.

(ii)    After receiving the Order, Bitmain will send an order receipt confirmation email to the Purchaser. The Purchaser's Order will be open and valid for Bitmain to issue an Order Con irmation for a period of twenty-four (24) hours after its placement, and prior to the expiration of such period, Bitmain will have the right to cancel the Order at its sole discretion if the Purchaser fails to pay the down payment in accordance with Appendix A of this Agreement.

5

(iii)    The Purchaser's Order shall be deemed accepted by Bitmain upon Bitmain's issuance of the Order Confirmation and the Purchaser shall pay the Total Purchase Price in accordance with Appendix A of this Agreement.

(iv)    Upon receipt of the Total Purchase Price, Bitmain will provide a payment receipt to the Purchaser.

(v)    Bitmain will send a shipping confirmation to the Purchaser after it has delivered the Product(s) to the carrier.

2.2.    Both Parties acknowledge and agree that the order receipt confirmation shall not constitute nor be construed as Bitmain's acceptance of the Purchaser's Order, but mere acknowledgement of the receipt of the Purchaser's Order and the Total Purchase Price.

2.3.    Both Parties acknowledge and agree that in case of product unavailability, Bitmain shall have the right to cancel the Order after it has issued the order receipt confirmation without any penalty or liability.

The Purchaser acknowledges and confirms that the Order is irrevocable and cannot be cancelled by the Purchaser, and that the Product(s) ordered are neither returnable nor refundable. All sums paid by the Purchaser to Bitmain shall not be subject to any abatement, set-off, claim, counterclaim, adjustment, reduction, or defense for any reason except for non-shipment of the Products pursuant to Section 4.3. Payment of Total Purchase Price is not refundable, save as otherwise mutually agreed by the Parties or Bitmain's non-shipment of the Products pursuant to Section 4.3.

## 3.   Prices and Terms of Payment

3.1    The Purchaser shall pay the Total Purchase Price in accordance with Appendix A of this Agreement.

3.2    The Parties understand and agree that the applicable prices of the Product(s) are inclusive of applicable bank transaction fees, export duties, but are exclusive of any and all applicable import duties, taxes and governmental charges. The Purchaser shall pay or reimburse Bitmain for all taxes levied on or assessed against the amounts payable hereunder. If any payment is subject to withholding, the Purchaser shall pay such additional amounts as necessary, to ensure that Bitmain receives the full amount it would have received had payment not been subject to such withholding.

## 4.   Shipping of Product(s)

4.1    The Purchaser must indicate place of delivery, and Bitmain will ship the Product(s) to such designated place. If the Purchaser fails to provide Bitmain with the delivery place or the delivery place provided by the Purchaser is a false address or does not exist, Bitmain may issue the Purchaser a notice of self-pick-up (which shall specify the self-pick-up location) and ask the Purchaser to pick up the Products itself. The earliest date for self-pick-up mentioned in the above notice shall be deemed as the delivery date. Bitmain shall be deemed to have completed the delivery obligation under this Agreement when the Purchaser receives the above notice. The Purchaser shall pick up all the Products within ive (5) working days after receiving the notice from Bitmain. Otherwise, Bitmain is entitled to charge the Purchaser the storage fee, warehousing charge and other fees according to the standard of USD 2/ unit / day.

4.2    Subject to the limitations stated in Appendix A, the terms of delivery of the Product(s) shall be CIP (carriage and insurance paid according to Incoterms 2010) to the place of delivery designated by the Purchaser. Once the Product(s) have been delivered to the carrier and the full purchase price of the Products is adequately covered by insurance during international transport with the bene iciary of such insurance being the Purchaser, Bitmain shall have fulfilled its obligation to supply the Product(s) to the Purchaser, and the title and risk of loss or damage to the Product(s) shall pass to the Purchaser.

4.3    All delivery dates in Appendix A are estimated, but not guaranteed. In the case that Purchaser has fulfilled its payment obligations in accordance with the terms and conditions of this Agreement and Bitmain fails to deliver the Products within the shipping period listed in Appendix A, the Purchaser is entitled to submit a written reminder to Bitmain. If Bitmain fails to deliver the Products within 30 days after receiving the written reminder from the Purchaser, the Purchaser is entitled, to: (i) request to terminate this Agreement and require Bitmain to return the amounts paid by the Purchaser without setoff or adjustment (Bitmain shall not pay any interests in this respect), or (ii) continue to perform this Agreement and require Bitmain to deliver the Products.

4.4    Bitmain shall not be responsible for any delivery delay caused by the Purchaser or any third party, including but not limited to the carrier, the customs, and the import brokers, nor shall it be liable for damages, whether direct, indirect, incidental, consequential, or otherwise, for any failure, delay or error in delivery of any Product(s) for any reason whatsoever.

4.5    Subject to the Products being adequately covered by insurance during delivery of the Products to the Purchaser, Bitmain shall not be responsible and the Purchaser shall be fully and exclusively responsible for any loss of Product(s), personal injury, property damage, other damage or liability caused by the Product(s) or the transportation of the Product(s) either to the Purchaser or any third party, or theft of the Product(s) during transportation from Bitmain to the Purchaser.

4.6    Bitmain has the right to discontinue the sale of the Product(s) and to make changes to its Product(s) at any time, without prior approval from or notice to the Purchaser.

4.7   If the Product(s) is rejected and/or returned back to Bitmain because of any reason and regardless of the cause of such delivery failure, the Purchaser shall be solely and exclusively liable for and shall defend, fully indemnify and hold harmless Bitmain against any and all related expenses, fees, charges and costs incurred, arising out of or incidental to such rejection and/or return (the "**Return Expense**"). Furthermore, if the Purchaser would like to ask for Bitmain's assistance in redelivering such Product(s) or assist in any other manner, and if Bitmain at its sole discretion decides to provide this assistance, then in addition to the Return Expense, the Purchaser shall also pay Bitmain an administrative fee in accordance with Bitmain's then applicable internal policy.

## 5.   Customs

5.1   Bitmain shall obtain in due time and maintain throughout the term of this Agreement (if applicable), any and all approvals, permits, authorizations, licenses and clearances for the export of the Product(s) that are required to be obtained by Bitmain or the carrier under Applicable Laws.

5.2   The Purchaser shall obtain in due time and maintain throughout the term of this Agreement (if applicable), any and all approvals, permits, authorizations, licenses and clearances required for the import of the Product(s) to the country of delivery as indicated in the Shipping Information, that are required to be obtained by the Purchaser or the carrier under Applicable Laws, and shall be responsible for any and all additional fees, expenses and charges in relation to the import of the Product(s).

## 6.   Warranty

6.1   Bitmain warrants to the Purchaser that during the Warranty Period, each Product will conform to the applicable product requirements and specifications and perform and operate as intended and as set forth on Bitmain's website for each Product. The Warranty Period shall start on the Warranty Start Date and end on the 365th day after the Warranty Start Date or 90 days after return shipment of a repaired Product covered by this warranty. During the Warranty Period, the Purchaser's sole and exclusive remedy, and Bitmain's entire liability, will be to repair or replace, at Bitmain's option, the defective part/component of the Product(s) or the defective Product(s) at no charge to the Purchaser including, but not limited to, any applicable testing or shipping charges.

6.2   The Parties acknowledge and agree that the warranty provided by Bitmain as stated in the preceding paragraph does not apply to the following items caused by the Purchaser:

(i)     normal wear and tear;

(ii)    damage resulting from accident, abuse, misuse, neglect, improper handling or improper installation;

8

(iii)   damage or loss of the Product(s) caused by undue physical or electrical stress, including but not limited to moisture, corrosive environments, high voltage surges, extreme temperatures, shipping, or abnormal working conditions;

(iv)   damage or loss of the Product(s) caused by acts of nature including, but not limited to, floods, storms, fires, and earthquakes;

(v)   damage caused by operator error, or non-compliance with instructions as set out in accompanying documentation;

(vi)   alterations by persons other than Bitmain, associated partners or authorized service facilities;

(vii)   Product(s), on which the original software has been replaced or modified by persons other than Bitmain, associated partners or authorized service facilities;

(viii)   use of counterfeit products;

(ix)   damage or loss of data due to interoperability with current and/or future versions of operating system, software and/or hardware;

(x)   damage or loss of data caused by improper usage and behavior which is not recommended and/or permitted in the product documentation;

(xi)   failure of the Product(s) caused by usage of products not supplied by Bitmain; and

(xii)   hash boards or chips are burnt.

In case the warranty is voided, Bitmain may, at its sole discretion, provide repair service to the Purchaser, and the Purchaser shall bear all related expenses and costs.

6.3   Notwithstanding anything to the contrary herein, the Purchaser acknowledges and agrees that the Product(s) provided by Bitmain do not guarantee any cryptocurrency mining time and, Bitmain shall not be liable for any cryptocurrency mining time loss or cryptocurrency mining revenue loss that are caused by downtime of any part/component of the Product(s). Bitmain does not warrant that the Product(s) will meet the Purchaser's requirements or the Product(s) will be uninterrupted or error free. Except as provided in Clause 6.1 of this Agreement, Bitmain makes no warranties to the Purchaser with respect to the Product(s), and no warranties of any kind, whether written, oral, express, implied or statutory, including warranties of merchantability, fitness for a particular purpose or non-infringement or arising from course of dealing or usage in trade shall apply.

9

6.4   In the event of any ambiguity or discrepancy between this Clause 6 of this Agreement and Bitmain's After-sales Service Policy from time to time, it is intended that the After-sales Service Policy shall prevail and the Parties shall comply with and give effect to the After-sales Service Policy.

## 7   Representations and Warranties

The Purchaser makes the following representations and warranties to Bitmain:

7.1   It has the full power and authority to purchase the Products and carry on its businesses.

7.2   The obligations expressed to be assumed by it under this Agreement are legal, valid, binding and enforceable obligations.

7.3   It has the power to enter into, perform and deliver, and has taken all necessary action to authorize its entry into, performance and delivery of, this Agreement and the transactions contemplated by this Agreement.

7.4   The entry into and performance by it of, and the transactions contemplated by, this Agreement do not and will not conflict with:

(i)     any Applicable Law;

(ii)    its constitutional documents; or

(iii)   any agreement or instrument binding upon it or any of its assets.

7.5   All authorizations required or desirable:

(i)     to enable it lawfully to enter into, exercise its rights under and comply with its obligations under this Agreement;

(ii)    to ensure that those obligations are legal, valid, binding and enforceable; and

(iii)    to make this Agreement admissible in evidence in its jurisdiction of incorporation,

have been or will have been by the time, obtained or effected and are, or will be by the appropriate time, in full force and effect.

7.6    It is not aware of any circumstances which are likely to lead to:

(i)    any authorization obtained or effected not remaining in full force and effect;

(ii)    any authorization not being obtained, renewed or effected when required or desirable; or

(iii)    any authorization being subject to a condition or requirement which it does not reasonably expect to satisfy or the compliance with which has or could reasonably be expected to have a material adverse effect.

7.7    (a) It is not the target of economic sanctions administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, the United Nations Security Council, the European Union, Her Majesty's Treasury or Singapore ("Sanctions"), including by being listed on the Specially Designated Nationals and Blocked Persons (SDN) List maintained by OFAC or any other Sanctions list maintained by one of the foregoing governmental authorities, directly or indirectly owned or controlled by one or more SDNs or other Persons included on any other Sanctions list, or located, organized or resident in a country or territory that is the target of Sanctions, and (b) the purchase of the Product(s) will not violate any Sanctions or import and export control related laws and regulations.

7.8    All information supplied by the Purchaser is and shall be true and correct, and the information does not contain and will not contain any statement that is false or misleading.

## 8    Indemnification and Limitation of Liability

8.1    Each party shall, during the term of this Agreement and at any time thereafter, indemnify and save each other harmless from and against any and all damages, suits, claims, judgments, liabilities, losses, fees, costs or expenses of any kind, including legal fees, whatsoever arising out of or incidental to the Products pursuant to this Agreement, including but not limited, to any Product(s) infringing on Intellectual Property Rights of a third party.

8.2    Notwithstanding anything to the contrary herein, neither party shall under no circumstances, be liable to each other for any consequential loss, or loss of goodwill, business, anticipated profits, revenue, contract, or business opportunity arising out of or in connection with this Agreement, and each party hereby waives any claim it may at any time have against the other in respect of any such damages. The foregoing limitation of liability shall apply whether in an action at law, including but not limited to contract, strict liability, negligence, willful misconduct or other tortious action, or an action in equity.

8.3    Each Parties' cumulative aggregate liability pursuant to this Agreement, whether arising from tort, breach of contract or any other cause of action shall be limited to and not exceed the amount of one hundred percent (100%) of the Total Purchase Price actually received by Bitmain from the Purchaser and paid by the Purchaser to Bitmain for the Product(s).

8.4    The Product(s) are not designed, manufactured or intended for use in hazardous or critical environments or in activities requiring emergency or fail-safe operation, such as the operation of nuclear facilities, aircraft navigation or communication systems or in any other applications or activities in which failure of the Product(s) may pose the risk of environmental harm or physical injury or death to humans. Bitmain specifically disclaims any express or implied warranty of fitness for any of the above described application and any such use shall be at the Purchaser's sole risk.

8.5   The above limitations and exclusions shall apply (1) notwithstanding failure of essential purpose of any exclusive or limited remedy; and (2) whether or not such party has been advised of the possibility of such damages. This Clause allocates the risks under this Agreement and the pricing reflects this allocation of risk and the above limitations.

## 9   Distribution

9.1   This Agreement does not constitute a distributor agreement between Bitmain and the Purchaser. Therefore, the Purchaser is not an authorized distributor of Bitmain.

9.2   The Purchaser shall in no event claim or imply to a third party that it is an authorized distributor of Bitmain or Bitmain (Antminer) or any similar terms, or perform any act that will cause it to be construed as an authorized distributor of Bitmain or Bitmain (Antminer). As between the Purchaser and Bitmain, the Purchaser shall be exclusively and fully responsible for complying with the Applicable Laws regarding repackaging the Product(s) for the Purchaser's redistribution needs, and shall be solely liable for any and all liabilities or costs directly incurred or incidental to such redistribution.

## 10   Intellectual Property Rights

10.1   The Parties agree that the Intellectual Property Rights in any way contained in the Product(s), made, conceived or developed by Bitmain and/or its Affiliates for the Product(s) under this Agreement and/or, achieved, derived from, related to, connected with the provision of the Product(s) by Bitmain and/or acquired by Bitmain from any other person in performance of this Agreement shall be the exclusive property of Bitmain and/or its Affiliates.

10.2   Notwithstanding anything to the contrary herein, all Intellectual Property Rights in the Product(s) shall remain the exclusive property of Bitmain and/or its licensors. Except for licenses explicitly identified in Bitmain's shipping confirmation or in this Clause 10.2, no rights or licenses are expressly granted, or implied, whether by estoppel or otherwise, in respect of any Intellectual Property Rights of Bitmain and/or its Affiliates or any Intellectual Property residing in the Product(s) provided by Bitmain to the Purchaser, including in any documentation or any data furnished by Bitmain. Bitmain grants the Purchaser a non-exclusive, non-transferrable, royalty-free and irrevocable license of Bitmain and/or its Affiliates' Intellectual Property Rights to solely use the Product(s) delivered by Bitmain to the Purchaser for their ordinary function, and subject to the Clauses set forth herein. The Purchaser shall in no event violate the Intellectual Property Rights of Bitmain and/or its licensors.

12

10.3    If applicable, payment by the Purchaser of non-recurring charges to Bitmain for any special designs, or engineering or production materials required for Bitmain's performance of Orders for customized Product(s), shall not be construed as payment for the assignment from Bitmain to the Purchaser of title to the design or special materials. Bitmain shall be the sole owner of such special designs, engineering or production materials.

## 11    Confidential Information and Disclosure

11.1    All information concerning this Agreement and matters pertaining to or derived from the provision of Product(s) pursuant to this Agreement between the Parties, whether in oral or written form, or in the form of drawings, computer programs or other, as well as all data derived therefrom ("Confidential Information"), shall be deemed to be confidential and, as such, may not be divulged to any unauthorized person. The Parties undertake and agree to take all reasonable and practicable steps to ensure and protect the confidentiality of the Confidential Information which cannot be passed, sold, traded, published or disclosed to any unauthorized person.

11.2    Notwithstanding Section 11.1, Bitmain acknowledges and agrees that Purchaser is a U.S. publicly traded company and may be required to disclose this Agreement and its related terms, in order to comply with applicable securities laws, including its disclosure obligations under the U.S. Securities Exchange Act of 1934, as amended.

## 12    Term and Termination of this Agreement

12.1    This Agreement will be effective upon Bitmain's issuance of the shipping confirmation to the Purchaser, provided that if there is more than one shipping confirmation, this Agreement will be effective to the Products contained in each shipping confirmation upon Bitmain's issuance of the respective shipping confirmation to the Purchaser.

12.2    Bitmain shall be entitled to terminate this Agreement with immediate effect upon written notice to the Purchaser if:

(i)      the Purchaser fails to comply in any material respect of this Agreement, and where that failure is capable of being remedied, fails to remedy it within thirty (30) days of being required by Bitmain to do so;

(ii)     it is or becomes unlawful for the Purchaser to perform or comply with any of its material obligations under this Agreement or all or a material part of the obligations of the Purchaser under this Agreement are not or cease to be valid, binding and enforceable; or

(iii)    an Insolvency Event occurs in respect of the Purchaser.

13

12.3   The Purchaser shall be entitled to terminate this Agreement with immediate effect upon written notice to Bitmain if Bitmain fails to deliver the Product(s) to the carrier in accordance with the delivery dates indicated in the shipping confirmation, and fails to remedy it within the time period pursuant to Section 4.3 of being required by the Purchaser to do so.

12.4   This Agreement shall also be automatically terminated between the Parties if the Order is cancelled because of any reason stated in this Agreement.

12.5   Termination of this Agreement shall be without prejudice to the rights and liabilities of the Parties accrued prior to or as a result of such termination, including those related to antecedent breaches. Termination of this Agreement for any cause or otherwise shall not release a Party from any liability which at the time of termination has already accrued to the other Party or which thereafter may accrue in respect of any act or omission prior to such termination. The rights and obligations of the Parties under Clause 1 (Definitions and Interpretations), Clause 10 (Intellectual Property Rights), Clause 11 (Con idential Information and Disclosure), Clause 12 (Term and Termination of this Agreement), Clause 13 (Contact Information), Clause 14 (Compliance with Laws and Regulations) and Clause 21 (Governing Law and Dispute Resolution) shall survive the termination of this Agreement.

## 13   Contact Information

All communications in relation to this Agreement shall be made to the following contacts:

**Purchaser's business contact:**

Name: Jeff McGonegal

Phone: +1 303-794-2000, [****]

Email: [****]

**Bitmain's business contact:**

Name: Peng LI

Phone: [****]

Email: [****]

## 14   Compliance with Laws and Regulations

14.1   The Purchaser undertakes that it will fully comply with all Applicable Laws in relation to export and import control and Sanctions and shall not take any action that would cause Bitmain or any of its Affiliates to be in violation of any export and import control laws or Sanctions. The Purchaser shall also be fully and exclusively liable for and shall defend, fully indemnify and hold harmless Bitmain and/or its Affiliates from and against any and all claims, demands, actions, costs or proceedings brought or instituted against Bitmain and/or its Affiliates arising out of or in connection with any breach by the Purchaser or the carrier of any Applicable Laws in relation to export and import control or Sanction.

14.2   The Purchaser acknowledges and agrees that the Product(s) in this Agreement are subject to the export control laws and regulations of all related countries, including but not limited to the Export Administration Regulations ("EAR") of the United States. Without limiting the foregoing, the Purchaser shall not, without receiving the proper licenses or license exceptions from all related governmental authorities, including but not limited to the U.S. Bureau of Industry and Security, distribute, re-distribute, export, re-export, or transfer any Product(s) subject to this Agreement either directly or indirectly, to any national of any country identified in Country Groups D:1 or E:1 as defined in the EARs. In addition, the Product(s) under this Agreement may not be exported, re-exported, or transferred to (a) any person or entity listed on the "Entity List", "Denied Persons List" or the SDN List as such lists are maintained by the U.S. Government, or (b) an end-user engaged in activities related to weapons of mass destruction. Such activities include but are not necessarily limited to activities related to: (1) the design, development, production, or use of nuclear materials, nuclear facilities, or nuclear weapons; (2) the design, development, production, or use of missiles or support of missiles projects; and (3) the design, development, production, or use of chemical or biological weapons. The Purchaser further agrees that it will not do any of the foregoing in violation of any restriction, law, or regulation of the European Union or an individual EU member state that imposes on an exporter a burden equivalent to or greater than that imposed by the U.S. Bureau of Industry and Security.

14.3   The Purchaser undertakes that it will not take any action under this Agreement or use the Product(s) in a way that will be a breach of any anti-money laundering laws, any anti-corruption laws, and/or any counter-terrorist financing laws.

14.4   The Purchaser warrants that the Product(s) have been purchased with funds that are from legitimate sources and such funds do not constitute proceeds of criminal conduct, or realizable property, or proceeds of terrorism financing or property of terrorist, within the meaning given in the Corruption, Drug Trafficking and Other Serious Crimes (Confiscation of Benefits) Act (Chapter 65A) and the Terrorism (Suppression of Financing) Act (Chapter 325), respectively. The Purchaser understands that if any Person resident in Singapore knows or suspects or has reasonable grounds for knowing or suspecting that another Person is engaged in criminal conduct or is involved with terrorism or terrorist property and the information for that knowledge or suspicion came to their attention in the course of business in the regulated sector, or other trade, profession, business or employment, the Person will be required to report such knowledge or suspicion to the Suspicious Transaction Reporting Office, Commercial Affairs Department of the Singapore Police Force. The Purchaser acknowledges that such a report shall not be treated as breach of confidence or violation of any restriction upon the disclosure of information imposed by any Applicable Law, contractually or otherwise.

**15  Force Majeure**

15.1  To the extent that a Party is fully or partially delayed, prevented or hindered by an event of Force Majeure from performing any obligation under this Agreement (other than an obligation to make payment), subject to the exercise of reasonable diligence by the affected Party, the failure to perform shall be excused by the occurrence of such event of Force Majeure. A Party claiming that its performance is excused by an event of Force Majeure shall, promptly after the occurrence of such event of Force Majeure, notify the other Party of the nature, date of inception and expected duration of such event of Force Majeure and the extent to which the Party expects that the event will delay, prevent or hinder the Party from performing its obligations under this Agreement. The notifying Party shall thereafter use its best effort to eliminate such event of Force Majeure and mitigate its effects.

15.2  The affected Party shall use reasonable diligence to remove the event of Force Majeure, and shall keep the other Party informed of all significant developments.

**16  Entire Agreement and Amendment**

This Agreement, including Appendix A, attached hereto and incorporated by reference herein, constitutes the entire agreement of the Parties hereto and can only be amended with the written consent of both Parties or otherwise as mutually agreed by both Parties.

**17  Assignment**

Bitmain may freely assign this Agreement in whole or in part to its Affiliates or to any third party. The Purchaser may not assign this Agreement in whole or in part without Bitmain's prior written consent.

**18  Severability**

To the extent possible, if any provision of this Agreement is held to be illegal, invalid or unenforceable in whole or in part by a court, the provision shall apply with whatever deletion or modification is necessary so that such provision is legal, valid and enforceable and gives effect to the commercial intention of the Parties. The remaining provisions of this Agreement shall not be affected and shall remain in full force and effect.

**19  Personal Data**

Depending on the nature of the Purchaser's interaction with Bitmain, some examples of personal data which Bitmain may collect from the Purchaser include the Purchaser's name and identification information, contact information such as the Purchaser's address, email address and telephone number, nationality, gender, date of birth, and financial information such as credit card numbers, debit card numbers and bank account information.

Bitmain generally does not collect the Purchaser's personal data unless (a) it is provided to Bitmain voluntarily by the Purchaser directly or via a third party who has been duly authorized by the Purchaser to disclose the Purchaser's personal data to Bitmain (the Purchaser's "authorized representative") after (i) the Purchaser (or the Purchaser's authorized representative) has been notified of the purposes for which the data is collected, and (ii) the Purchaser (or the Purchaser's authorized representative) has provided written consent to the collection and usage of the Purchaser's personal data for those purposes, or (b) collection and use of personal data without consent is permitted or required by related laws. Bitmain shall seek the Purchaser's consent before collecting any additional personal data and before using the Purchaser's personal data for a purpose which has not been notified to the Purchaser (except where permitted or authorized by law).

## 20   Conflict with the Terms and Conditions

In the event of any ambiguity or discrepancy between the Clauses of this Agreement and the Terms and Conditions from time to time, it is intended that the Clauses of this Agreement shall prevail and the Parties shall comply with and give effect to this Agreement.

## 21   Governing Law and Dispute Resolution

21.1   This Agreement shall be solely governed by and construed in accordance with the laws of Hong Kong, as modified by the United Nations Convention on Contracts for the International Sale of Goods (the "UNCISG").

21.2   Any dispute, controversy, difference or claim arising out of or relating to this Agreement, including the existence, validity, interpretation, performance, breach or termination hereof or any dispute regarding non-contractual obligations arising out of or relating to this Agreement shall be referred to and finally resolved by arbitration administered by the Hong Kong International Arbitration Center under the UNCITRAL Arbitration Rules in force when the notice of arbitration is submitted. The law of this arbitration clause shall be Hong Kong law, as modified and subject to the UNCISG. The seat of arbitration shall be Hong Kong. The arbitration proceedings shall be conducted in English. The number of arbitrators shall be three unless otherwise subsequently agreed in writing by the Parties.

## 22   Waiver

Failure by either Party to enforce at any time any provision of this Agreement, or to exercise any election of options provided herein shall not constitute a waiver of such provision or option, nor affect the validity of this Agreement or any part hereof, or the right of the waiving Party to thereafter enforce each and every such provision or option.

## 23  Counterparts and Electronic Signatures

This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement, and all of which, when taken together, will be deemed to constitute one and the same agreement. The facsimile, email or other electronically delivered signatures of the Parties shall be deemed to constitute original signatures, and facsimile or electronic copies hereof shall be deemed to constitute duplicate originals.

## 24  Further Assurance

Each Party undertakes to the other Party to execute or procure to be executed all such documents and to do or procure to be done all such other acts and things as may be reasonable and necessary to give all Parties the full benefit of this Agreement.

## 25  Third Party Rights

A person who is not a Party to this Agreement has no right under the Contracts (Rights of Third Parties) Ordinance (Chapter 623 of the Laws of Hong Kong) to enforce or to enjoy the benefit of any term of this Agreement.

*(The rest part of the page is intentionally left in blank)*

18

Signed for and on behalf of Bitmain

**Bitmain Technologies Limited**


By: _**/s/ Jihan Wu**_
Name: _Jihan Wu_
Title: _CEO_


Signed for and on behalf of the Purchaser

**Riot Blockchain, Inc.**

By: _**/s/ Jeffrey McGonegal**_
Name: _Jeffrey McGonegal_
Title: _Chief Executive Officer_

**APPENDIX A**

This Appendix A (this "Appendix A") specifies the Products sold by <u>Bitmain Technologies Limited</u> ("Bitmain") to <u>Riot Blockchain, Inc.</u> (the "Purchaser") (Bitmain and the Purchaser, collectively, the "Parties" and each a "Party") pursuant to the purchase and sale agreement (the "Agreement") between the Parties, as well as the specific payment and delivery terms applicable to the Products under the Agreement.

1.  Per the Purchaser's request, Bitmain will provide the following Product(s) upon full payment in accordance with the terms specified hereunder to the Purchaser on or before the dates specified herein:

| Description of Product(s) | Price | | |
|---|---|---|---|
| | Estimated Unit price | Units | Total |
| Antminer S19 Pro 110TH/s, 1-31 May 2021 | US$3,160.00 | 1,000 | US$3,160,000.00 |
| Antminer S19 Pro 110TH/s, 1-30 Jun 2021 | US$3,070.00 | 1,000 | US$3,070,000.00 |
| Antminer S19 Pro 110TH/s, 1-31 Jul 2021 | US$3,070.00 | 1,000 | US$3,070,000.00 |
| First Carrier: Estimated Shipping cost to USA via Aircargo | | | TBD |
| [****]Discount | | | US$722,610.00 |
| TOTAL PRODUCT PURCHASE PRICE: US$8,577,390.00 | | | |
| Address for delivery | | [****] | |

2.  The Parties confirm that the total hashrate of the Products under this Agreement shall not be less than <u>330,000.00 </u>TH/s.

3.  Where the actual Products provided by Bitmain are not in consistence with the description listed in Article 1 of Appendix A, provided that all the following three requirements are met, the unit price and/or quantity of the Products can be adjusted by Bitmain based on the actual type of the Products before delivery. The types, quantity and unit price of the actual delivered Products shall be subject to the statement issued by Bitmain. the Purchaser shall not refuse to accept the Products on the grounds that the types, quantity and/or unit price of the actual delivered Products are inconsistent with Article 1 of Appendix A:

(1) The total hashrate of the Products actually delivered by Bitmain to the Purchaser shall not be less than the total hashrate as stipulated in Article 2 of Appendix A;

(2) The Products actually delivered by Bitmain to the Purchaser are S19 Pro Series Products; and

(3) The total price of the Products actually delivered by Bitmain to the Purchaser shall not exceed the Total Purchase Price of the Products as stipulated in Article 1 of Appendix A.

4. **Bitmain's BANK ACCOUNT info:**

Company Name：Bitmain Technologies Limited

Company address：FLAT/RM A1 11/F SUCCESS COMMERCIAL BUILDING 245-251 HENNESSY ROAD HK

Account No.: [****]

Bank name: [****]

Bank address: [****]

Swift Code: [****]

5. The payment shall be arranged by the Purchaser as follows:

(1) Thirty percent (30%) of the Total Purchase Price of the Product(s) as listed above (or the corresponding Proforma Invoice) shall be paid as a refundable down payment within forty-eight (48) hours upon the Order Confirmation/Signing of the Contract by the Purchaser, otherwise the Order will be canceled and Bitmain shall not be required to review and/or to confirm the Order;

(2) The Purchaser shall pay the twenty percent (20%) of the Total Purchase Price of the Product(s) as listed above (or the corresponding Proforma Invoice) prior to December 31, 2020;

(3) The Purchaser shall pay the remaining fifty percent (50%) of the Total Purchase Price of the Product(s) as listed above (or the corresponding Proforma Invoice) in equal monthly installments due as follows:

   a) Fifteen percent (15%) no later than 45 days prior to each scheduled delivery period or before March 15, 2021 (the "Due Date") as to the first (1st) installment of the Products to be shipped to the Purchaser in May 2021;

   b) Twenty percent (20%) no later than 45 days prior to each scheduled delivery period or April 15, 2021 (the "Due Date") as to the second (2nd) installment of the Products to be shipped to the Purchaser in May 2021; and

21

c) Fifteen percent (15%) no later than 45 days prior to each scheduled delivery period or <u>May 15, 2021</u> (the "Due Date") as to the third (3rd) and final installment of the Products to be shipped to the Purchaser in June 2021.

(4) In case the Purchaser fails to meet any of the above payment due date, the Order will be canceled and the down payment will not be refunded by Bitmain to the Purchaser. Payments shall be made in United States Dollars (USD) by wire transfer to Bitmain's Bank Account, or in any other currency and by any other payment method as may be agreed by both Parties. Bitmain will send a payment receipt to the Purchaser after confirming the remittance of each installment of the Total Purchase Price specified above no later than the second (2nd) day after it receives the same.

6. Subject to the timely payment of the Purchase Price as specified in the foregoing Article 5 of this Appendix A, Bitmain shall deliver the Products described in this Appendix A to the Purchaser pursuant to the terms and conditions set forth in the Agreement at the address for delivery specified by the Purchaser in this Appendix A (as may be updated from time to time by providing written notice to Bitmain no less than ten (10) days in advance of each of the delivery dates listed below) according to the following schedule:

a) 1,000 Units on or before May 31, 2021;

b) 1,000 Units on or before June 30, 2021;

c) The remaining 1,000 Units on or before July 31, 2021.

7. Without prejudice to the above, the unit price and the Total Purchase Price of the Product(s) and any amount paid by the Purchaser shall be all denominated in USD. Where the Parties agree that the payments shall be made in cryptocurrencies, the exchange rate between the USD and the cryptocurrency selected shall be determined and calculated as follows: (1) in the event that the Purchaser pays for any order placed on Bitmain's official website (the "Website", http://www.bitmain.com) which is valid and has not been fully paid yet, the exchange rate between United States Dollars and the cryptocurrency fixed in such placed order shall apply, or (2) in any other case, the real time exchange rate between the USD and the cryptocurrency displayed on the Website upon payment shall apply. The exchange rate between the USD and the cryptocurrency shall be fixed according to this provision. In any circumstance, the Purchaser shall not ask for any refund due to the change of exchange rate.

8. The Parties hereby acknowledge and agree that the terms of this Appendix A form an integral part of the essential terms and conditions of the Agreement, are incorporated by reference into and made part of the Agreement, and represent the final agreement of the Parties with respect to the purchase and sale of the Products specified herein. The Parties hereby further acknowledge and agree, for the avoidance of doubt, that where the terms of this Appendix A and the Agreement conflict, the terms of this Appendix A shall control in all respects.

Exhibit 10.2

[****] Certain information in this exhibit has been omitted pursuant to Item 601(b)(10)(iv) of Regulation S-K because it is both (i) not material and (ii) would likely cause competitive harm to the registrant if publicly disclosed.

# SALES AND PURCHASE AGREEMENT

## BETWEEN

## Bitmain Technologies Limited
## ("Bitmain")

## AND

## Riot Blockchain, Inc.
## ("Purchaser")

1. Definitions and Interpretations                                    3
2. Sales of Product(s)                                                5
3. Prices and Terms of Payment                                        6
4. Shipping of Product(s)                                             6
5. Customs                                                            8
6. Warranty                                                           8
7  Representations and Warranties                                    10
8  Indemnification and Limitation of Liability                       11
9  Distribution                                                      12
10  Intellectual Property Rights                                     12
11  Confidential Information and Disclosure                          13
12  Term and Termination of this Agreement                           13
13  Contact Information                                              14
14  Compliance with Laws and Regulations                             14
15  Force Majeure                                                    16
16  Entire Agreement and Amendment                                   16
17  Assignment                                                       16
18  Severability                                                     16
19  Personal Data                                                    16
20  Conflict with the Terms and Conditions                           17
21  Governing Law and Dispute Resolution                             17
22  Waiver                                                           17
23  Counterparts and Electronic Signatures                           18
24  Further Assurance                                                18
25  Third Party Rights                                               18

This agreement (this "Agreement") is made on <u>December 18, 2020</u> by and between Bitmain Technologies Limited ("Bitmain") (Company number: [****]), with its registered office at Unit A1 of Unit A, 11th Floor, Success Commercial Building, 245-251 Hennessy Road, Hong Kong, and Riot Blockchain, Inc. (the "Purchaser") with its principal place of business at 202 6th Street, Suite 401, Castle Rock, CO 80104, USA.

Bitmain and the Purchaser shall hereinafter collectively be referred to as the "Parties", and individually as a "Party".

Whereas:

1.  Purchaser fully understands the market risks, the price-setting principles and the market fluctuations relating to the Products sold under this Agreement.

2.  Purchaser has purchased Products through the website of Bitmain (i.e., https://shop.bitmain.com/, similarly hereinafter), and is generally familiar with the purchase order processes of Bitmain's website.

3.  Based on the above consensus, the Purchaser is willing to purchase and Bitmain is willing to supply cryptocurrency mining hardware and other equipment in accordance with the terms and conditions of this Agreement.

The Parties hereto agree as follows:

**1.   Definitions and Interpretations**

The following terms, as used herein, have the following meanings:

"Affiliate" means, with respect to any Person, any other Person directly or indirectly Controlling, Controlled by, or under common Control with such Person; "Person" means any individual, corporation, partnership, limited partnership, proprietorship, association, limited liability company, firm, trust, estate or other enterprise or entity (whether or not having separate legal personality); and "Control" means the power or authority, whether exercised or not, to direct the business, management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, provided that such power or authority shall conclusively be presumed to exist upon possession of beneficial ownership or power to direct the vote of more than fifty percent (50%) of the votes entitled to be cast at a meeting of the members or shareholders of such Person or power to control the composition of a majority of the board of directors of such Person. The terms "Controlled" and "Controlling" have meanings correlative to the foregoing.

"Applicable Law" means any treaty, law, decree, order, regulation, decision, statute, ordinance, rule, directive, code or other document that has legal force under any system of law, including, without limitation, local law, law of any other state or part thereof or international law, and which creates or purports to create any requirement or rule that may affect, restrict, prohibit or expressly allow the terms of this Agreement or any activity contemplated or carried out under this Agreement.

3

"Bank Account" means the bank account information of Bitmain provided in Appendix A of this Agreement.

"Force Majeure" means in respect of either Party, any event or occurrence whatsoever beyond the reasonable control of that Party, which delays, prevents or hinders that Party from performing any obligation imposed upon that Party under this Agreement, including to the extent such event or occurrence shall delay, prevent or hinder such Party from performing such obligation, war (declared or undeclared), terrorist activities, acts of sabotage, blockade, fire, lightning, acts of god, national strikes, riots, insurrections, civil commotions, quarantine restrictions, epidemics, earthquakes, landslides, avalanches, floods, hurricanes, explosions and regulatory and administrative or similar action or delays to take actions of any governmental authority.

"Insolvency Event" in the context of the Purchaser means any of the following events:

i)      a receiver, receiver and manager, judicial manager, official manager, trustee, administrator or similar official is appointed, or steps are taken for such appointment, over all or any part of the assets, equipment or undertaking of the Purchaser;

ii)     if the Purchaser stops or suspends payments to its creditors generally, is unable to or admits its inability to pay its debts as they fall due, seeks to enter into any composition or other arrangement with its creditors, is declared or becomes bankrupt or insolvent or enters into liquidation;

iii)    a petition is presented, a proceeding is commenced, an order is made or an effective resolution is passed or any other steps are taken by any person for the liquidation, winding up, insolvency, judicial management, administration, reorganisation, reconstruction, dissolution or bankruptcy of the Purchaser, otherwise than for the purpose of a bona fide scheme of solvent amalgamation or reconstruction; or

iv)     if any event, process or circumstance analogous or having a substantially similar effect to any of the above, in any applicable jurisdiction, commences or exists.

"Intellectual Property Rights" means any and all intellectual property rights, including but not limited to those concerning inventions, patents, utility models, registered designs and models, engineering or production materials, drawings, trademarks, service marks, domain names, applications for any of the foregoing (and the rights to apply for any of the foregoing), proprietary or business sensitive information and/or technical know-how, copyright, authorship, whether registered or not, and any neighbor rights.

"Order" means the Purchaser's request to Bitmain for certain Product(s) in accordance with this Agreement.

"Order Confirmation" means Bitmain's acceptance of the Order.

"Product(s)" means the merchandise that Bitmain will provide to the Purchaser in accordance with this Agreement.

"Total Purchase Price" means the aggregate amount payable by the Purchaser as set out in Appendix A of this Agreement.

"Warranty Period" means the period of time that the Product(s) are covered by the warranty granted by Bitmain or its Affiliates in accordance with Clause 6 of this Agreement.

"Warranty Start Date" means the date on which the Product(s) are delivered to the carrier.

Interpretations:

i)    Words importing the singular include the plural and vice versa where the context so requires.

ii)   The headings in this Agreement are for convenience only and shall not be taken into consideration in the interpretation or construction of this Agreement.

iii)  References to Clauses and Appendix(es) are references to Clauses and Appendix(es) of this Agreement.

iv)   Unless specifically stated otherwise, all references to days shall mean calendar days.

v)    Any reference to a code, law, statute, statutory provision, statutory instrument, order, regulation or other instrument of similar effect shall include any re-enactment or amendment thereof for the time being in force.

## 2.   Sales of Product(s)

Bitmain will provide the Product(s) set forth in Appendix A (attached hereto as part of this Agreement) to the Purchaser in accordance with provisions of Clause 2, Clause 3, Clause 4, Clause 5 and Appendix A of this Agreement, and the Purchaser shall make payment in accordance with the terms specified in this Agreement.

2.1.  Both Parties agree that the Product(s) shall be sold in accordance with the following steps:

(i)   The Purchaser shall place the Order through Bitmain's website or through other methods accepted by Bitmain, and such Order shall constitute an irrevocable offer to purchase specific Product(s) from Bitmain.

(ii)  After receiving the Order, Bitmain will send an order receipt confirmation email to the Purchaser. The Purchaser's Order will be open and valid for Bitmain to issue an Order Confirmation for a period of twenty-four (24) hours after its placement, and prior to the expiration of such period, Bitmain will have the right to cancel the Order at its sole discretion if the Purchaser fails to pay the down payment in accordance with Appendix A of this Agreement.

(iii)   The Purchaser's Order shall be deemed accepted by Bitmain upon Bitmain's issuance of the Order Confirmation and the Purchaser shall pay the Total Purchase Price in accordance with Appendix A of this Agreement.

(iv)   Upon receipt of the Total Purchase Price, Bitmain will provide a payment receipt to the Purchaser.

(v)   Bitmain will send a shipping confirmation to the Purchaser after it has delivered the Product(s) to the carrier.

2.2.   Both Parties acknowledge and agree that the order receipt confirmation shall not constitute nor be construed as Bitmain's acceptance of the Purchaser's Order, but mere acknowledgement of the receipt of the Purchaser's Order and the Total Purchase Price.

2.3.   Both Parties acknowledge and agree that in case of product unavailability, Bitmain shall have the right to cancel the Order after it has issued the order receipt confirmation without any penalty or liability.

2.4.   The Purchaser acknowledges and confirms that the Order is irrevocable and cannot be cancelled by the Purchaser, and that the Product(s) ordered are neither returnable nor refundable. All sums paid by the Purchaser to Bitmain shall not be subject to any abatement, set-off, claim, counterclaim, adjustment, reduction, or defense for any reason except for non-shipment of the Products pursuant to Section 4.3. Payment of Total Purchase Price is not refundable, save as otherwise mutually agreed by the Parties or Bitmain's non-shipment of the Products pursuant to Section 4.3.

## 3.   Prices and Terms of Payment

3.1   The Purchaser shall pay the Total Purchase Price in accordance with Appendix A of this Agreement.

3.2   The Parties understand and agree that the applicable prices of the Product(s) are inclusive of applicable bank transaction fees, export duties, but are exclusive of any and all applicable import duties, taxes and governmental charges. The Purchaser shall pay or reimburse Bitmain for all taxes levied on or assessed against the amounts payable hereunder. If any payment is subject to withholding, the Purchaser shall pay such additional amounts as necessary, to ensure that Bitmain receives the full amount it would have received had payment not been subject to such withholding.

## 4.   Shipping of Product(s)

4.1    The Purchaser must indicate place of delivery, and Bitmain will ship the Product(s) to such designated place. If the Purchaser fails to provide Bitmain with the delivery place or the delivery place provided by the Purchaser is a false address or does not exist, Bitmain may issue the Purchaser a notice of self-pick-up (which shall specify the self-pick-up location) and ask the Purchaser to pick up the Products itself. The earliest date for self-pick-up mentioned in the above notice shall be deemed as the delivery date. Bitmain shall be deemed to have completed the delivery obligation under this Agreement when the Purchaser receives the above notice. The Purchaser shall pick up all the Products within five (5) working days after receiving the notice from Bitmain. Otherwise, Bitmain is entitled to charge the Purchaser the storage fee, warehousing charge and other fees according to the standard of USD 2/ unit / day.

4.2    Subject to the limitations stated in Appendix A, the terms of delivery of the Product(s) shall be CIP (carriage and insurance paid according to Incoterms 2010) to the place of delivery designated by the Purchaser. Once the Product(s) have been delivered to the carrier and the full purchase price of the Products is adequately covered by insurance during international transport with the beneficiary of such insurance being the Purchaser, Bitmain shall have fulfilled its obligation to supply the Product(s) to the Purchaser, and the title and risk of loss or damage to the Product(s) shall pass to the Purchaser.

4.3    All delivery dates in Appendix A are estimated, but not guaranteed. In the case that Purchaser has fulfilled its payment obligations in accordance with the terms and conditions of this Agreement and Bitmain fails to deliver the Products within the shipping period listed in Appendix A, the Purchaser is entitled to submit a written reminder to Bitmain. If Bitmain fails to deliver the Products within 30 days after receiving the written reminder from the Purchaser, the Purchaser is entitled, to: (i) request to terminate this Agreement and require Bitmain to return the amounts paid by the Purchaser without setoff or adjustment (Bitmain shall not pay any interests in this respect), or (ii) continue to perform this Agreement and require Bitmain to deliver the Products.

4.4    Bitmain shall not be responsible for any delivery delay caused by the Purchaser or any third party, including but not limited to the carrier, the customs, and the import brokers, nor shall it be liable for damages, whether direct, indirect, incidental, consequential, or otherwise, for any failure, delay or error in delivery of any Product(s) for any reason whatsoever.

4.5    Subject to the Products being adequately covered by insurance during delivery of the Products to the Purchaser, Bitmain shall not be responsible and the Purchaser shall be fully and exclusively responsible for any loss of Product(s), personal injury, property damage, other damage or liability caused by the Product(s) or the transportation of the Product(s) either to the Purchaser or any third party, or theft of the Product(s) during transportation from Bitmain to the Purchaser.

4.6    Bitmain has the right to discontinue the sale of the Product(s) and to make changes to its Product(s) at any time, without prior approval from or notice to the Purchaser.

4.7     If the Product(s) is rejected and/or returned back to Bitmain because of any reason and regardless of the cause of such delivery failure, the Purchaser shall be solely and exclusively liable for and shall defend, fully indemnify and hold harmless Bitmain against any and all related expenses, fees, charges and costs incurred, arising out of or incidental to such rejection and/or return (the "**Return Expense**"). Furthermore, if the Purchaser would like to ask for Bitmain's assistance in redelivering such Product(s) or assist in any other manner, and if Bitmain at its sole discretion decides to provide this assistance, then in addition to the Return Expense, the Purchaser shall also pay Bitmain an administrative fee in accordance with Bitmain's then applicable internal policy.

## 5.   Customs

5.1     Bitmain shall obtain in due time and maintain throughout the term of this Agreement (if applicable), any and all approvals, permits, authorizations, licenses and clearances for the export of the Product(s) that are required to be obtained by Bitmain or the carrier under Applicable Laws.

5.2     The Purchaser shall obtain in due time and maintain throughout the term of this Agreement (if applicable), any and all approvals, permits, authorizations, licenses and clearances required for the import of the Product(s) to the country of delivery as indicated in the Shipping Information, that are required to be obtained by the Purchaser or the carrier under Applicable Laws, and shall be responsible for any and all additional fees, expenses and charges in relation to the import of the Product(s).

## 6.   Warranty

6.1     Bitmain warrants to the Purchaser that during the Warranty Period, each Product will conform to the applicable product requirements and specifications and perform and operate as intended and as set forth on Bitmain's website for each Product. The Warranty Period shall start on the Warranty Start Date and end on the 365th day after the Warranty Start Date or 90 days after return shipment of a repaired Product covered by this warranty. During the Warranty Period, the Purchaser's sole and exclusive remedy, and Bitmain's entire liability, will be to repair or replace, at Bitmain's option, the defective part/component of the Product(s) or the defective Product(s) at no charge to the Purchaser including, but not limited to, any applicable testing or shipping charges.

6.2     The Parties acknowledge and agree that the warranty provided by Bitmain as stated in the preceding paragraph does not apply to the following items caused by the Purchaser:

(i)      normal wear and tear;

(ii)     damage resulting from accident, abuse, misuse, neglect, improper handling or improper installation;

(iii)   damage or loss of the Product(s) caused by undue physical or electrical stress, including but not limited to moisture, corrosive environments, high voltage surges, extreme temperatures, shipping, or abnormal working conditions;

(iv)   damage or loss of the Product(s) caused by acts of nature including, but not limited to, floods, storms, fires, and earthquakes;

(v)   damage caused by operator error, or non-compliance with instructions as set out in accompanying documentation;

(vi)   alterations by persons other than Bitmain, associated partners or authorized service facilities;

(vii)   Product(s), on which the original software has been replaced or modified by persons other than Bitmain, associated partners or authorized service facilities;

(viii)   use of counterfeit products;

(ix)   damage or loss of data due to interoperability with current and/or future versions of operating system, software and/or hardware;

(x)   damage or loss of data caused by improper usage and behavior which is not recommended and/or permitted in the product documentation;

(xi)   failure of the Product(s) caused by usage of products not supplied by Bitmain; and

(xii)   hash boards or chips are burnt.

In case the warranty is voided, Bitmain may, at its sole discretion, provide repair service to the Purchaser, and the Purchaser shall bear all related expenses and costs.

6.3   Notwithstanding anything to the contrary herein, the Purchaser acknowledges and agrees that the Product(s) provided by Bitmain do not guarantee any cryptocurrency mining time and, Bitmain shall not be liable for any cryptocurrency mining time loss or cryptocurrency mining revenue loss that are caused by downtime of any part/component of the Product(s). Bitmain does not warrant that the Product(s) will meet the Purchaser's requirements or the Product(s) will be uninterrupted or error free. Except as provided in Clause 6.1 of this Agreement, Bitmain makes no warranties to the Purchaser with respect to the Product(s), and no warranties of any kind, whether written, oral, express, implied or statutory, including warranties of merchantability, fitness for a particular purpose or non-infringement or arising from course of dealing or usage in trade shall apply.

9

6.4   In the event of any ambiguity or discrepancy between this Clause 6 of this Agreement and Bitmain's After-sales Service Policy from time to time, it is intended that the After-sales Service Policy shall prevail and the Parties shall comply with and give effect to the After-sales Service Policy.

## 7   Representations and Warranties

The Purchaser makes the following representations and warranties to Bitmain:

7.1   It has the full power and authority to purchase the Products and carry on its businesses.

7.2   The obligations expressed to be assumed by it under this Agreement are legal, valid, binding and enforceable obligations.

7.3   It has the power to enter into, perform and deliver, and has taken all necessary action to authorize its entry into, performance and delivery of, this Agreement and the transactions contemplated by this Agreement.

7.4   The entry into and performance by it of, and the transactions contemplated by, this Agreement do not and will not conflict with:

(i)     any Applicable Law;

(ii)    its constitutional documents; or

(iii)   any agreement or instrument binding upon it or any of its assets.

7.5   All authorizations required or desirable:

(i)     to enable it lawfully to enter into, exercise its rights under and comply with its obligations under this Agreement;

(ii)    to ensure that those obligations are legal, valid, binding and enforceable; and

(iii)   to make this Agreement admissible in evidence in its jurisdiction of incorporation,

have been or will have been by the time, obtained or effected and are, or will be by the appropriate time, in full force and effect.

7.6   It is not aware of any circumstances which are likely to lead to:

(i)     any authorization obtained or effected not remaining in full force and effect;

(ii)    any authorization not being obtained, renewed or effected when required or desirable; or

(iii)    any authorization being subject to a condition or requirement which it does not reasonably expect to satisfy or the compliance with which has or could reasonably be expected to have a material adverse effect.

7.7    (a) It is not the target of economic sanctions administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, the United Nations Security Council, the European Union, Her Majesty's Treasury or Singapore ("Sanctions"), including by being listed on the Specially Designated Nationals and Blocked Persons (SDN) List maintained by OFAC or any other Sanctions list maintained by one of the foregoing governmental authorities, directly or indirectly owned or controlled by one or more SDNs or other Persons included on any other Sanctions list, or located, organized or resident in a country or territory that is the target of Sanctions, and (b) the purchase of the Product(s) will not violate any Sanctions or import and export control related laws and regulations.

7.8    All information supplied by the Purchaser is and shall be true and correct, and the information does not contain and will not contain any statement that is false or misleading.

## 8    Indemnification and Limitation of Liability

8.1    Each party shall, during the term of this Agreement and at any time thereafter, indemnify and save each other harmless from and against any and all damages, suits, claims, judgments, liabilities, losses, fees, costs or expenses of any kind, including legal fees, whatsoever arising out of or incidental to the Products pursuant to this Agreement, including but not limited, to any Product(s) infringing on Intellectual Property Rights of a third party.

8.2    Notwithstanding anything to the contrary herein, neither party shall under no circumstances, be liable to each other for any consequential loss, or loss of goodwill, business, anticipated profits, revenue, contract, or business opportunity arising out of or in connection with this Agreement, and each party hereby waives any claim it may at any time have against the other in respect of any such damages. The foregoing limitation of liability shall apply whether in an action at law, including but not limited to contract, strict liability, negligence, willful misconduct or other tortious action, or an action in equity.

8.3    Each Parties' cumulative aggregate liability pursuant to this Agreement, whether arising from tort, breach of contract or any other cause of action shall be limited to and not exceed the amount of one hundred percent (100%) of the Total Purchase Price actually received by Bitmain from the Purchaser and paid by the Purchaser to Bitmain for the Product(s).

8.4    The Product(s) are not designed, manufactured or intended for use in hazardous or critical environments or in activities requiring emergency or fail-safe operation, such as the operation of nuclear facilities, aircraft navigation or communication systems or in any other applications or activities in which failure of the Product(s) may pose the risk of environmental harm or physical injury or death to humans. Bitmain specifically disclaims any express or implied warranty of fitness for any of the above described application and any such use shall be at the Purchaser's sole risk.

11

8.5     The above limitations and exclusions shall apply (1) notwithstanding failure of essential purpose of any exclusive or limited remedy; and (2) whether or not such party has been advised of the possibility of such damages. This Clause allocates the risks under this Agreement and the pricing reflects this allocation of risk and the above limitations.

## 9     Distribution

9.1     This Agreement does not constitute a distributor agreement between Bitmain and the Purchaser. Therefore, the Purchaser is not an authorized distributor of Bitmain.

9.2     The Purchaser shall in no event claim or imply to a third party that it is an authorized distributor of Bitmain or Bitmain (Antminer) or any similar terms, or perform any act that will cause it to be construed as an authorized distributor of Bitmain or Bitmain (Antminer). As between the Purchaser and Bitmain, the Purchaser shall be exclusively and fully responsible for complying with the Applicable Laws regarding repackaging the Product(s) for the Purchaser's redistribution needs, and shall be solely liable for any and all liabilities or costs directly incurred or incidental to such redistribution.

## 10   Intellectual Property Rights

10.1    The Parties agree that the Intellectual Property Rights in any way contained in the Product(s), made, conceived or developed by Bitmain and/or its Affiliates for the Product(s) under this Agreement and/or, achieved, derived from, related to, connected with the provision of the Product(s) by Bitmain and/or acquired by Bitmain from any other person in performance of this Agreement shall be the exclusive property of Bitmain and/or its Affiliates.

10.2  Notwithstanding anything to the contrary herein, all Intellectual Property Rights in the Product(s) shall remain the exclusive property of Bitmain and/or its licensors. Except for licenses explicitly identified in Bitmain's shipping confirmation or in this Clause 10.2, no rights or licenses are expressly granted, or implied, whether by estoppel or otherwise, in respect of any Intellectual Property Rights of Bitmain and/or its Affiliates or any Intellectual Property residing in the Product(s) provided by Bitmain to the Purchaser, including in any documentation or any data furnished by Bitmain. Bitmain grants the Purchaser a non-exclusive, non-transferrable, royalty-free and irrevocable license of Bitmain and/or its Affiliates' Intellectual Property Rights to solely use the Product(s) delivered by Bitmain to the Purchaser for their ordinary function, and subject to the Clauses set forth herein. The Purchaser shall in no event violate the Intellectual Property Rights of Bitmain and/or its licensors.

10.3  If applicable, payment by the Purchaser of non-recurring charges to Bitmain for any special designs, or engineering or production materials required for Bitmain's performance of Orders for customized Product(s), shall not be construed as payment for the assignment from Bitmain to the Purchaser of title to the design or special materials. Bitmain shall be the sole owner of such special designs, engineering or production materials.

## 11  Confidential Information and Disclosure

11.1  All information concerning this Agreement and matters pertaining to or derived from the provision of Product(s) pursuant to this Agreement between the Parties, whether in oral or written form, or in the form of drawings, computer programs or other, as well as all data derived therefrom ("Confidential Information"), shall be deemed to be confidential and, as such, may not be divulged to any unauthorized person. The Parties undertake and agree to take all reasonable and practicable steps to ensure and protect the confidentiality of the Confidential Information which cannot be passed, sold, traded, published or disclosed to any unauthorized person.

11.2  Notwithstanding Section 11.1, Bitmain acknowledges and agrees that Purchaser is a U.S. publicly traded company and may be required to disclose this Agreement and its related terms, in order to comply with applicable securities laws, including its disclosure obligations under the U.S. Securities Exchange Act of 1934, as amended.

## 12  Term and Termination of this Agreement

12.1  This Agreement will be effective upon Bitmain's issuance of the shipping confirmation to the Purchaser, provided that if there is more than one shipping confirmation, this Agreement will be effective to the Products contained in each shipping confirmation upon Bitmain's issuance of the respective shipping confirmation to the Purchaser.

12.2  Bitmain shall be entitled to terminate this Agreement with immediate effect upon written notice to the Purchaser if:

(i)  the Purchaser fails to comply in any material respect of this Agreement, and where that failure is capable of being remedied, fails to remedy it within thirty (30) days of being required by Bitmain to do so;

(ii)  it is or becomes unlawful for the Purchaser to perform or comply with any of its material obligations under this Agreement or all or a material part of the obligations of the Purchaser under this Agreement are not or cease to be valid, binding and enforceable; or

(iii)  an Insolvency Event occurs in respect of the Purchaser.

12.3   The Purchaser shall be entitled to terminate this Agreement with immediate effect upon written notice to Bitmain if Bitmain fails to deliver the Product(s) to the carrier in accordance with the delivery dates indicated in the shipping confirmation, and fails to remedy it within the time period pursuant to Section 4.3 of being required by the Purchaser to do so.

12.4   This Agreement shall also be automatically terminated between the Parties if the Order is cancelled because of any reason stated in this Agreement.

12.5   Termination of this Agreement shall be without prejudice to the rights and liabilities of the Parties accrued prior to or as a result of such termination, including those related to antecedent breaches. Termination of this Agreement for any cause or otherwise shall not release a Party from any liability which at the time of termination has already accrued to the other Party or which thereafter may accrue in respect of any act or omission prior to such termination. The rights and obligations of the Parties under Clause 1 (Definitions and Interpretations), Clause 10 (Intellectual Property Rights), Clause 11 (Confidential Information and Disclosure), Clause 12 (Term and Termination of this Agreement), Clause 13 (Contact Information), Clause 14 (Compliance with Laws and Regulations) and Clause 21 (Governing Law and Dispute Resolution) shall survive the termination of this Agreement.

## 13   Contact Information

All communications in relation to this Agreement shall be made to the following contacts:

**Purchaser**'s **business contact:**

Name: Jeff McGonegal

Phone: +1 303-794-2000, [****]

Email: [****]

**Bitmain's business contact:**

Name: Peng LI

Phone: [****]

Email: [****]

## 14   Compliance with Laws and Regulations

14.1   The Purchaser undertakes that it will fully comply with all Applicable Laws in relation to export and import control and Sanctions and shall not take any action that would cause Bitmain or any of its Affiliates to be in violation of any export and import control laws or Sanctions. The Purchaser shall also be fully and exclusively liable for and shall defend, fully indemnify and hold harmless Bitmain and/or its Affiliates from and against any and all claims, demands, actions, costs or proceedings brought or instituted against Bitmain and/or its Affiliates arising out of or in connection with any breach by the Purchaser or the carrier of any Applicable Laws in relation to export and import control or Sanction.

14.2   The Purchaser acknowledges and agrees that the Product(s) in this Agreement are subject to the export control laws and regulations of all related countries, including but not limited to the Export Administration Regulations ("EAR") of the United States. Without limiting the foregoing, the Purchaser shall not, without receiving the proper licenses or license exceptions from all related governmental authorities, including but not limited to the U.S. Bureau of Industry and Security, distribute, re-distribute, export, re-export, or transfer any Product(s) subject to this Agreement either directly or indirectly, to any national of any country identified in Country Groups D:1 or E:1 as defined in the EARs. In addition, the Product(s) under this Agreement may not be exported, re-exported, or transferred to (a) any person or entity listed on the "Entity List", "Denied Persons List" or the SDN List as such lists are maintained by the U.S. Government, or (b) an end-user engaged in activities related to weapons of mass destruction. Such activities include but are not necessarily limited to activities related to: (1) the design, development, production, or use of nuclear materials, nuclear facilities, or nuclear weapons; (2) the design, development, production, or use of missiles or support of missiles projects; and (3) the design, development, production, or use of chemical or biological weapons. The Purchaser further agrees that it will not do any of the foregoing in violation of any restriction, law, or regulation of the European Union or an individual EU member state that imposes on an exporter a burden equivalent to or greater than that imposed by the U.S. Bureau of Industry and Security.

14.3   The Purchaser undertakes that it will not take any action under this Agreement or use the Product(s) in a way that will be a breach of any anti-money laundering laws, any anti-corruption laws, and/or any counter-terrorist financing laws.

14.4   The Purchaser warrants that the Product(s) have been purchased with funds that are from legitimate sources and such funds do not constitute proceeds of criminal conduct, or realizable property, or proceeds of terrorism financing or property of terrorist, within the meaning given in the Corruption, Drug Trafficking and Other Serious Crimes (Confiscation of Benefits) Act (Chapter 65A) and the Terrorism (Suppression of Financing) Act (Chapter 325), respectively. The Purchaser understands that if any Person resident in Singapore knows or suspects or has reasonable grounds for knowing or suspecting that another Person is engaged in criminal conduct or is involved with terrorism or terrorist property and the information for that knowledge or suspicion came to their attention in the course of business in the regulated sector, or other trade, profession, business or employment, the Person will be required to report such knowledge or suspicion to the Suspicious Transaction Reporting Office, Commercial Affairs Department of the Singapore Police Force. The Purchaser acknowledges that such a report shall not be treated as breach of confidence or violation of any restriction upon the disclosure of information imposed by any Applicable Law, contractually or otherwise.

## 15  Force Majeure

15.1  To the extent that a Party is fully or partially delayed, prevented or hindered by an event of Force Majeure from performing any obligation under this Agreement (other than an obligation to make payment), subject to the exercise of reasonable diligence by the affected Party, the failure to perform shall be excused by the occurrence of such event of Force Majeure. A Party claiming that its performance is excused by an event of Force Majeure shall, promptly after the occurrence of such event of Force Majeure, notify the other Party of the nature, date of inception and expected duration of such event of Force Majeure and the extent to which the Party expects that the event will delay, prevent or hinder the Party from performing its obligations under this Agreement. The notifying Party shall thereafter use its best effort to eliminate such event of Force Majeure and mitigate its effects.

15.2  The affected Party shall use reasonable diligence to remove the event of Force Majeure, and shall keep the other Party informed of all significant developments.

## 16  Entire Agreement and Amendment

This Agreement, including Appendix A, attached hereto and incorporated by reference herein, constitutes the entire agreement of the Parties hereto and can only be amended with the written consent of both Parties or otherwise as mutually agreed by both Parties.

## 17  Assignment

Bitmain may freely assign this Agreement in whole or in part to its Affiliates or to any third party. The Purchaser may not assign this Agreement in whole or in part without Bitmain's prior written consent.

## 18  Severability

To the extent possible, if any provision of this Agreement is held to be illegal, invalid or unenforceable in whole or in part by a court, the provision shall apply with whatever deletion or modification is necessary so that such provision is legal, valid and enforceable and gives effect to the commercial intention of the Parties. The remaining provisions of this Agreement shall not be affected and shall remain in full force and effect.

## 19  Personal Data

Depending on the nature of the Purchaser's interaction with Bitmain, some examples of personal data which Bitmain may collect from the Purchaser include the Purchaser's name and identification information, contact information such as the Purchaser's address, email address and telephone number, nationality, gender, date of birth, and financial information such as credit card numbers, debit card numbers and bank account information.

16

Bitmain generally does not collect the Purchaser's personal data unless (a) it is provided to Bitmain voluntarily by the Purchaser directly or via a third party who has been duly authorized by the Purchaser to disclose the Purchaser's personal data to Bitmain (the Purchaser's "authorized representative") after (i) the Purchaser (or the Purchaser's authorized representative) has been notified of the purposes for which the data is collected, and (ii) the Purchaser (or the Purchaser's authorized representative) has provided written consent to the collection and usage of the Purchaser's personal data for those purposes, or (b) collection and use of personal data without consent is permitted or required by related laws. Bitmain shall seek the Purchaser's consent before collecting any additional personal data and before using the Purchaser's personal data for a purpose which has not been notified to the Purchaser (except where permitted or authorized by law).

## 20   Conflict with the Terms and Conditions

In the event of any ambiguity or discrepancy between the Clauses of this Agreement and the Terms and Conditions from time to time, it is intended that the Clauses of this Agreement shall prevail and the Parties shall comply with and give effect to this Agreement.

## 21   Governing Law and Dispute Resolution

21.1   This Agreement shall be solely governed by and construed in accordance with the laws of Hong Kong, as modified by the United Nations Convention on Contracts for the International Sale of Goods (the "UNCISG").

21.2   Any dispute, controversy, difference or claim arising out of or relating to this Agreement, including the existence, validity, interpretation, performance, breach or termination hereof or any dispute regarding non-contractual obligations arising out of or relating to this Agreement shall be referred to and finally resolved by arbitration administered by the Hong Kong International Arbitration Center under the UNCITRAL Arbitration Rules in force when the notice of arbitration is submitted. The law of this arbitration clause shall be Hong Kong law, as modified and subject to the UNCISG. The seat of arbitration shall be Hong Kong. The arbitration proceedings shall be conducted in English. The number of arbitrators shall be three unless otherwise subsequently agreed in writing by the Parties.

## 22   Waiver

Failure by either Party to enforce at any time any provision of this Agreement, or to exercise any election of options provided herein shall not constitute a waiver of such provision or option, nor affect the validity of this Agreement or any part hereof, or the right of the waiving Party to thereafter enforce each and every such provision or option.

## 23  Counterparts and Electronic Signatures

This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement, and all of which, when taken together, will be deemed to constitute one and the same agreement. The facsimile, email or other electronically delivered signatures of the Parties shall be deemed to constitute original signatures, and facsimile or electronic copies hereof shall be deemed to constitute duplicate originals.

## 24  Further Assurance

Each Party undertakes to the other Party to execute or procure to be executed all such documents and to do or procure to be done all such other acts and things as may be reasonable and necessary to give all Parties the full benefit of this Agreement.

## 25  Third Party Rights

A person who is not a Party to this Agreement has no right under the Contracts (Rights of Third Parties) Ordinance (Chapter 623 of the Laws of Hong Kong) to enforce or to enjoy the benefit of any term of this Agreement.

*(The rest part of the page is intentionally left in blank)*

Signed for and on behalf of Bitmain

**Bitmain Technologies Limited**


By: **/s/ Jihan Wu**
Name: Jihan Wu
Title: CEO


Signed for and on behalf of the Purchaser

**Riot Blockchain, Inc.**

By: **/s/ Jeffrey McGonegal**
Name: Jeffrey McGonegal
Title: Chief Executive Officer

19

**APPENDIX A**

This Appendix A (this "Appendix A") specifies the Products sold by <u>Bitmain Technologies Limited</u> ("Bitmain") to <u>Riot Blockchain, Inc.</u> (the "Purchaser") (Bitmain and the Purchaser, collectively, the "Parties" and each a "Party") pursuant to the purchase and sale agreement (the "Agreement") between the Parties, as well as the specific payment and delivery terms applicable to the Products under the Agreement.

1.  Per the Purchaser's request, Bitmain will provide the following Product(s) upon full payment in accordance with the terms specified hereunder to the Purchaser on or before the dates specified herein:

| Description of Product(s) | Price | | |
|---|---|---|---|
| | Estimated Unit price | Units | Total |
| Antminer S19j Pro-100TH/s, 1-31 Aug 2021 | US$2,377.00 | 2,000 | US$4,754,000.00 |
| Antminer S19j Pro-100TH/s, 1-30 Sep 2021 | US$2,377.00 | 4,000 | US$9,508,000.00 |
| Antminer S19j Pro-100TH/s, 1-31 Oct 2021 | US$2,377.00 | 6,000 | US$14,262,000.00 |
| First Carrier:  Estimated Shipping cost to USA via Aircargo | | | TBD |
| [****] Discount | | | US$ US$2,216,314.80 |
| **TOTAL PRODUCT PURCHASE PRICE: US$26,307,685.20** | | | |
| Address for delivery | | [****] | |

2.  The Parties confirm that the total hashrate of the Products under this Agreement shall not be less than [1,200,000.00] TH/s.

3.  Where the actual Products provided by Bitmain are not in consistence with the description listed in Article 1 of Appendix A, provided that all the following three requirements are met, the unit price and/or quantity of the Products can be adjusted by Bitmain based on the actual type of the Products before delivery. The types, quantity and unit price of the actual delivered Products shall be subject to the statement issued by Bitmain. the Purchaser shall not refuse to accept the Products on the grounds that the types, quantity and/or unit price of the actual delivered Products are inconsistent with Article 1 of Appendix A:

   (1)    The total hashrate of the Products actually delivered by Bitmain to the Purchaser shall not be less than the total hashrate as stipulated in Article 2 of Appendix A;

   (2)    The Products actually delivered by Bitmain to the Purchaser are <u>S19j Pro</u> Series Products; and

   (3)    The total price of the Products actually delivered by Bitmain to the Purchaser shall not exceed the Total Purchase Price of the Products as stipulated in Article 1 of Appendix A.

4.   Bitmain's BANK ACCOUNT info:

Company Name：Bitmain Technologies Limited
Company address：FLAT/RM A1 11/F SUCCESS COMMERCIAL BUILDING 245-251 HENNESSY ROAD HK
Account No.: [****]
Bank name: [****]
Bank address: [****]
Swift Code: [****]

5.   The payment shall be arranged by the Purchaser as follows:

   (1)  Ten percent (10%) of the Total Purchase Price of the Product(s) as listed above (or the corresponding Proforma Invoice) shall be paid as a refundable down payment within forty-eight (48) hours upon the Order Confirmation/Signing of the Contract by the Purchaser, otherwise the Order will be canceled and Bitmain shall not be required to review and/or to confirm the Order;

   (2)  The Purchaser shall pay the twenty percent (20%) of the Total Purchase Price of the Product(s) as listed above (or the corresponding Proforma Invoice) on or before January 15, 2021;

   (3)  The Purchaser shall pay the twenty percent (20%) of the Total Purchase Price of the Product(s) as listed above (or the corresponding Proforma Invoice) on or before February 25, 2021;

   (4)  The Purchaser shall pay the ten percent (10%) of the Total Purchase Price of the Product(s) as listed above (or the corresponding Proforma Invoice) on or before June 15, 2021;

   (5)  The Purchaser shall pay the fifteen percent (15%) of the Total Purchase Price of the Product(s) as listed above (or the corresponding Proforma Invoice) on or before July 15, 2021; and,

   (6)  The Purchaser shall pay the remaining twenty-five percent (25%) of the Total Purchase Price of the Product(s) as listed above (or the corresponding Proforma Invoice) on or before Aug 13, 2021;

(7) Payments shall be made in United States Dollars (USD) by wire transfer to Bitmain's Bank Account, or in any other currency and by any other payment method as may be agreed by both Parties. Bitmain will send a payment receipt to the Purchaser after confirming the remittance of each installment of the Total Purchase Price specified above no later than the second (2nd) day after it receives the same.

6. Subject to the timely payment of the Purchase Price as specified in the foregoing Article 5 of this Appendix A, Bitmain shall deliver the Products described in this Appendix A to the Purchaser pursuant to the terms and conditions set forth in the Agreement at the address for delivery specified by the Purchaser in this Appendix A (as may be updated from time to time by providing written notice to Bitmain no less than ten (10) days in advance of each of the delivery dates listed below) according to the following schedule:

(1) 2,000 Units on or before August 31, 2021;

(2) 4,000 Units on or before September 30, 2021;

(3) 6,000 Units on or before October 31, 2021

7. Without prejudice to the above, the unit price and the Total Purchase Price of the Product(s) and any amount paid by the Purchaser shall be all denominated in USD. Where the Parties agree that the payments shall be made in cryptocurrencies, the exchange rate between the USD and the cryptocurrency selected shall be determined and calculated as follows: (1) in the event that the Purchaser pays for any order placed on Bitmain's official website (the "Website", http://www.bitmain.com) which is valid and has not been fully paid yet, the exchange rate between United States Dollars and the cryptocurrency fixed in such placed order shall apply, or (2) in any other case, the real time exchange rate between the USD and the cryptocurrency displayed on the Website upon payment shall apply. The exchange rate between the USD and the cryptocurrency shall be fixed according to this provision. In any circumstance, the Purchaser shall not ask for any refund due to the change of exchange rate.

8. The Parties hereby acknowledge and agree that the terms of this Appendix A form an integral part of the essential terms and conditions of the Agreement, are incorporated by reference into and made part of the Agreement, and represent the final agreement of the Parties with respect to the purchase and sale of the Products specified herein. The Parties hereby further acknowledge and agree, for the avoidance of doubt, that where the terms of this Appendix A and the Agreement conflict, the terms of this Appendix A shall control in all respects.

**Riot Blockchain Purchases Additional 15,000 Antminers from Bitmain – Expanding 2021 Total Hash Rate Capacity Over 3.8 EH/s**

*Riot Continues Its Bitcoin Mining Hash Rate Growth with Additional Purchase Expanding Total Fleet to 37,640 Next-Generation Bitmain Antminers*

CASTLE ROCK, CO. December 21, 2020 (Globe Newswire) - **Riot Blockchain, Inc. (NASDAQ: RIOT) ("Riot", "Riot Blockchain" or the "Company")**, announces an expected 65% increase in bitcoin mining hash rate capacity resulting from the purchase and future deployment of 15,000 S19 Pro and S19j Pro Antminers from Bitmain Technologies Limited ("Bitmain"). The approximate $35 million purchase is comprised of 3,000 S19 Pro Antminers (110 TH) and 12,000 S19j Pro Antminers (100 TH). These additional miners are scheduled for receipt and deployment starting in May 2021 and continuing through October 2021.

This new order of miners, combined with the Company's prior miner purchases, is expected to significantly increase Riot's estimated bitcoin mining hash rate from the previously announced 2.3 EH/s to 3.8 EH/s. The Company has been receiving and deploying new miners consistently through 2020, including this new purchase; the delivery schedule continues into the fourth quarter of 2021.



At full deployment of Riot's 37,640 next-generation fleet of miners, Riot estimates its total operational hash rate capacity will be 3.8 EH/s and consume approximately 120 MW of energy. As a result, the Company expects to have an aggregate mining efficiency of 31.79±% 5 joules per terahash (J/TH).

"Continued growth in deployed miners is paramount to a miner's success," said Jeff McGonegal, CEO of Riot. "Expanding the Company's bitcoin mining hash rate and operating on a cost-effective basis is very important, particularly during periods when the bitcoin spot price has appreciably increased. We are pleased to have secured this latest purchase, especially given that the available supply of mining hardware continues to become increasingly scarce."

"We are extremely excited to expand and deepen our partnership with Riot Blockchain again this year. In total, Riot additionally purchased 15,000 Antminer 19 series. The 19 series enjoy a wide popularity in the global markets with outstanding hash rates and power efficiency, which continuously bring tremendous values to our customers around the world. I am confident that with the new purchase, Riot can continue to grow their mining operation and play an increasingly vital role in bitcoin mining across North America." said Irene Gao, Antminer Sales Director of NCSA Region, Bitmain.

All miner purchases continue to be funded using available working capital. Riot has no long-term debt. The Company is continuing to assess the bitcoin landscape with the assistance of XMS Capital in evaluating opportunities and transactions to further increase shareholder value.

**About Bitmain**

Founded in 2013, Bitmain transforms computing by building industry-defining technology in cryptocurrency, blockchain, and artificial intelligence (AI). Bitmain leads the industry in the production of integrated circuits for cryptocurrency mining, as well as mining hardware under the Antminer brand. The company also operates the largest cryptocurrency mining pools worldwide-Antpool.com and BTC.com. Bitmain technology supports a wide range of blockchain platforms and startups.

**About Riot Blockchain**

Riot Blockchain (NASDAQ: RIOT) focuses on cryptocurrency mining of bitcoin. The Company is expanding and upgrading its mining operations by securing the most energy efficient miners currently available. Riot also holds certain non-controlling investments in blockchain technology companies. Riot is headquartered in Castle Rock, Colorado, and the Company's primary mining facility was recently relocated to upstate New York, under a co-location hosting agreement with Coinmint. For more information, visit www.RiotBlockchain.com.

**Safe Harbor**

The information provided in this press release may include forward-looking statements relating to future events or the future financial performance of the Company. Because such statements are subject to risks and uncertainties, actual results may differ materially from those expressed or implied by such forward-looking statements. Words such as "anticipates," "believes," "plans," "expects," "intends," "will," "potential," "hope" and similar expressions are intended to identify forward-looking statements. These forward-looking statements are based upon current expectations of the Company and involve assumptions that may never materialize or may prove to be incorrect. Actual results and the timing of events could differ materially from those anticipated in such forward-looking statements as a result of various risks and uncertainties. Detailed information regarding factors that may cause actual results to differ materially from the results expressed or implied by statements in this press release relating to the Company may be found in the Company's periodic filings with the Securities and Exchange Commission, including the factors described in the sections entitled "Risk Factors," copies of which may be obtained from the SEC's website at www.sec.gov. The Company does not undertake any obligation to update forward-looking statements contained in this press release.

**For further information, please contact**:

**CONTACT:**
Media Contact:
PR@RiotBlockchain.com
Investor Contact:
IR@RiotBlockchain.com
SOURCE: Riot Blockchain, Inc.